No. 23-20118

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Diamond Services Corporation,

Plaintiff – Appellant

v.

Curtin Maritime Corporation; Department of Homeland Security; National Vessel Documentation Center; United States Coast Guard; United States of America; Commandant Linda L. Fagan, United States Coast Guard; Port of Houston Authority,

Defendants - Appellees

---

On Appeal from
United States District Court for the Southern District of Texas

4:22-CV-2117

---

BRIEF OF APPELLANT DIAMOND SERVICES CORPORATION

---

SUBMITTED BY:
Harry E. Morse
Martin S. Bohman
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Curtin Maritime Corporation | John Spiller, Jadd Masso, and Elizabeth Griffin of Clark Hill, P.L.C. Houston, TX |
| Department of Homeland Security, Linda Fagan, National Vessel Documentation Center, United States Coast Guard, and United States of America | Myra Siddiqui of U.S. Attorney's Office Houston, TX |
| Port of Houston Authority | Todd Mensing and Kelsi White of Ahmad Zavitsanos & Mensing, P.L.L.C. Houston, TX |

| Appellants: | Counsel for Appellants: |
|---|---|
| Diamond Services Corporation | Harry Morse and Martin Bohman of Bohman Morse, L.L.C. New Orleans, LA |

S/Harry E. Morse
Attorney of record for Diamond
Services Corporation

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This matter has significant impact on the United States dredging industry, and the interpretation of *Kisor v. Wilkie* in this Circuit.

# TABLE OF CONTENTS

**Contents**…………………………………………………………………**Pages**

Certificate of Interested Persons ............................................................... ii

Statement Regarding Oral Argument ...................................................... iii

Table of Contents ..................................................................................... iv

Table of Authorities ................................................................................ vii

Jurisdictional Statement ............................................................................ 1

Statement of the Issues .............................................................................. 1

Statement of the Case ................................................................................ 1

    1. The Coast Guard concluded the DB AVALON is built domestic, out of foreign parts ................................................................................... 1

    2. The district court found the Coast Guard's determination was entitled to *Auer* deference ..................................................................................... 6

Summary of the Argument ........................................................................ 8

Standard of Review .................................................................................. 11

    1. Summary Judgment .................................................................... 11

    2. Review of agency action ............................................................ 12

Argument .................................................................................................. 13

  1. The history of the Foreign Dredge Act, its implementing regulations, and judicial review of Coast Guard build and rebuild determinations ................. 13

    a. The Foreign Dredge Act and its implementing regulations .................. 13

iv

b. When the Coast Guard strays from the test of its regulations, courts correct the error ................................................................................. 16

2. The Coast Guard's approval of the DB AVALON is unmoored from the text of the regulations ................................................................................. 21

    a. The crane is a structural part of the superstructure ................................ 21

    b. The Coast Guard's approval of the DB AVALON does not engage with the text of the Coast Guard's regulations ................................ 24

    c. As applied to the crane on the DB AVALON, the memorandum contradicts the regulations ................................................................. 26

    d. The memorandum does not consider dredges ........................................ 30

3. Under *Kisor*, the Coast Guard is not entitled to deference ............................. 31

    a. The district court is not at liberty to rescue an agency's inadequate process ............................................................................................... 31

    b. The district court's definition fails to apply the plain meaning of the words ................................................................................................... 33

    c. The district court did not open, let alone exhaust, its interpretive toolbox. .............................................................................................. 34

    d. *Kisor* means what it says ....................................................................... 36

    e. There is no history of allowing foreign-built cranes on dredges .......... 39

4. The DB AVALON's Certificate of Documentation should be revoked .......... 40

5. Diamond has standing against Curtin ............................................................. 41

    a. Competitors have standing to challenge agency action or inaction under the APA ...................................................................................... 41

b. Every court, save the district court, has found competitors have standing to challenge Coast Guard approvals of foreign builds and rebuilds ......44

Conclusion .................................................................................................45

Certificate of Service .............................................................................46

Certificate of Compliance .....................................................................47

# TABLE OF AUTHORITIES

**Cases**………………………………………………………………………**Pages**

*Adams v. Watson*
    10 F.3d 915 (1st Cir. 1993) ........................................................43

*American Hawaii Cruises v. Skinner*
    713 F.Supp. 452 (D.D.C. 1989) ...........................................*passim*

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ....................................................................12

*Ass'n of Data Processing Serv. Orgs, Inc. v. Camp*
    397 U.S. 150 (1970) ....................................................................42

*Bank of Am. Corp. v. City of Miami*
    137 S.Ct. 1296 (2017) .................................................................44

*Brackeen v. Haaland*
    994 F.3d 249 (5th Cir. 2021) ................................................. 11-12

*Burhathoki v. Nielsen*
    898 F.3d 504 (5th Cir. 2018) ......................................................32

*Canadian Lumber Trade Alliance v. U.S.*
    517 F.3d 1319 (Fed. Cir. 2008) ............................................ 42-43

*Collins v. Mnuchin*
    938 F.3d 553 (5th Cir. 2021) ................................................ 43-44

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*
    467 U.S. 837 (1984) ....................................................................12

*Christensen v. Harris County*
    529 U.S. 576 (2000) ....................................................................13

*Clinton v. City of New York*
    524 U.S. 417 (1998) ....................................................................42

*Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*
    615 F.3d 599 (5th Cir. 2010) ........................................................................11

*Duncan v. Walker*
    533 U.S. 167 (2001) ...................................................................................39

*Gonzalez v. Liberty Mut. Fire Ins. Co.*
    981 F.Supp.2d 1219 (M.D. Fla. 2013) .......................................................23

*Hegel v. First Liberty Ins. Co.*
    778 F.3d 1214 (11th Cir. 2015) .................................................................23

*Hibbs v. Winn*
    542 U.S. 88 (2004) ............................................................................... 34-35

*Int'l Longshoremen's & Warehousemen's Union v Meese*
    891 F.2d 1374 (9th Cir. 1989) ...................................................................43

*Johnson v. BOKF Nat. Ass'n*
    15 F.4th 356 (5th Cir. 2021) ................................................................ 37-38

*Keystone Shipping Co. v. United States*
    801 F.Supp. 771 (D.D.C. 1992) .................................................................19

*Kisor v. McDonough*
    995 F.3d 1316 (Fed. Cir. 2020) .................................................................38

*Kisor v. Wilkie*
    139 S.Ct. 2400 (2019) ........................................................................passim

*La. Energy and Power Auth. v. FERC*
    141 F.3d 364 (D.C. Cir. 1998) ..................................................................42

*Lincoln v. Vigil*
    508 U.S. 182 (1993) ...................................................................................41

*Little v. KPMG LLP*
    575 F.3d 533 (5th Cir. 2009) ....................................................................43

*Lujan v. Defenders of Wildlife*

504 U.S. 555 (1992) ....................................................................42

*Marine Carriers Corp. v. Fowler*
    429 F.2d 702 (2d Cir. 1970)) ....................................................19

*Mendoza v. Perez*
    754 F.3d 1002 (D.C. Cir. 2014) ................................................42

*Nat'l Ass'n of Mfrs. v. Dept. of Def.*
    138 S.Ct. 617 (2018) ................................................................33

*Ortega Garcia v. United States*
    986 F.3d 513 (5th Cir. 2021) ...................................................12

*Pauley v. BethEnergy Mines, Inc.*
    501 U.S. 680 (1991) ................................................................12

*Philadelphia Metal Trades Council v. Allen*
    C/A No. 07-145, 2008 WL 4003380 (E.D. Pa. Aug. 21, 2008) . 20, 38-39, 44

*Schofield v. Saul*
    950 F.3d 315 (5th Cir. 2020) ...................................................38

*Shipbuilders Council of America v. United States Coast Guard*
    578 F.3d 234 (4th Cir. 2009) ...........................................*passim*

*Thomas Jefferson Univ. v. Shalala*
    512 U.S. 504 (1994) ........................................................... 11-12

*Thorpe v. Housing Authority of Durham*
    393 U.S. 268 (1969) ................................................................37

*United States v. Lachman*
    387 F.3d 42 (1st Cir. 2004) .....................................................39

*United States v. Larionoff*
    431 U.S. 864 (1977) ................................................................37

*United States v. Riccardi*
    989 F.3d 476, 486 (6th Cir. 2021) ...........................................33

**Statutes and Treatises**……………………………………………**Pages**

1 U.S.C. § 3 .................................................................33

5 U. S. C. § 702 ............................................................41

28 U.S.C. § 1291 ............................................................1

46 U.S.C. § 67.133 ........................................................19

46 U.S.C. § 12101 ..............................................3, 14, 16, 36

46 U.S.C. § 12107 ........................................................19

46 U.S.C. § 12112 ......................................................3, 14

46 U.S.C. § 12132 ........................................................14

46 U.S.C. § 55109 .......................................................3, 13

12 C.F.R. § 7.4001 .......................................................37

46 C.F.R. § 67.3 .....................................................*passim*

46 C.F.R. § 67.97 ....................................................*passim*

46 C.F.R. § 177 ......................................................*passim*

46 C.F.R. § 173.005 ......................................................29

46 C.F.R. § 173.020 ......................................................30

60 Fed. Reg. 17290 .......................................................28

Singer, Statutes and Statutory Construction § 46.06 (rev. 6th ed. 2000) .......... 34-35

3 K. Davis & R. Pierce, Administrative Law Treatise (3d ed. 1994)...................42

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §1291. This is an appeal of a final judgment.

## STATEMENT OF THE ISSUES

The following issues are presented for review:

1. Whether the District Court properly applied *Kisor* and *Auer* to the Coast Guard's conclusion the that the crane on a bucket dredge – the operative part of the dredge – is not a part of the vessel's superstructure because it is mere outfitting, instead of a structural part of the dredge above the main deck.

2. Whether the district court properly ruled that Diamond does not have standing under the Administrative Procedure Act to bring a suit against its competitor in the bucket dredging industry, Curtin, for violation of the Foreign Dredge Act and its regulations.

## STATEMENT OF THE CASE

1. The Coast Guard[1] concluded the DB AVALON is built domestic, out of <u>foreign parts.</u>

The Foreign Dredge Act requires that dredges be built in America, out of American parts, to work in U.S. territorial waters. Curtin Maritime is a dredging

---

[1] The National Vessel Documentation Center passes judgment on vessel build and rebuild applications. The NVDC is a part of the Coast Guard, which is a part of the Department of Transportation. APA cases are properly brought against the United States. For simplicity, Diamond refers to the federal defendants as the Coast Guard.

1

company, and it applied to the National Vessel Documentation Center under 46

C.F.R. § 177, seeking approval to build a bucket dredge, the DB AVALON. As

Curtin outlined, what would become the DB AVALON began as a domestic-built

deck barge. It became a dredge with the addition of a foreign-built crane and foreign-

built spuds. ROA.295-297. Curtin included a schematic of the dredge. ROA.298:



The Coast Guard approved the DB AVALON, finding that it was built or rebuilt domestic, out of domestic components: the Coast Guard concluded that the spuds are not a part of the dredge's hull or superstructure, and neither is the crane. ROA.285-87. Therefore, these parts could be built foreign and the DB AVALON is still entitled to a coastwise endorsement. In reaching this conclusion, the Coast Guard found that the DB AVALON complies with the Foreign Dredge Act and its interpreting regulations. ROA.286-87.

The Foreign Dredge Act, 46 U.S.C. § 55109(a)(3), provides that a vessel may engage in dredging in the navigable waters of the United States only if the vessel has been issued a certificate of documentation with a coastwise endorsement. For a vessel to be entitled to a certificate of documentation with a coastwise endorsement, the entire vessel must be built domestically. If a vessel is rebuilt, it must be rebuilt in the United States. 46 U.S.C. § 12112 governs vessel builds. It requires a vessel entitled to a coastwise endorsement to be "built in the United States." 46 U.S.C. § 12101 governs rebuilds. A vessel is rebuilt in the United States "only if the entire rebuilding, including the construction of any major component of the hull or superstructure," is done in the United States. To be built in the United States, under regulations at 46 C.F.R. § 67.97, a vessel must meet two criteria: all major components of the vessel's hull and superstructure must be fabricated in the United States, and the vessel must be assembled entirely in the United States.

3

The interpreting regulations give some flexibility such that not every part of a vessel must be built in the United States. First is the considerable part test, from 1957. Second is the major component test, from 1960. 46 C.F.R. § 67.177(a) provides that "regardless of its material construction, a vessel is deemed rebuilt when a major component of the hull or superstructure not built in the United States is added to the vessel." The considerable part test, 46 C.F.R. § 67.177(b), provides that a vessel is rebuilt foreign when work on its hull or superstructure is 10% or more of the vessel's steelweight. It is not rebuilt if the work is 7.5% or less of the vessel's steelweight. Between 7.5% and 10%, the Coast Guard has discretion. The contours of the major component test are not defined in the published regulations, but in memoranda, the Coast Guard has defined a major component as a new, separate and completely-constructed unit weighing more than 1.5% of the vessel's steelweight.

Separately, starting with proposed rulemaking in 1993, the Coast Guard has defined hull and superstructure at 46 C.F.R. § 67.3. The hull is "the shell, or outer casing, and internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." The superstructure is "the main deck and any other structural part above the main deck."

On top of these regulations, the Coast Guard has published memoranda. The memorandum at issue in this case was published in 2013 and revised repeatedly, most recently in 2021. ROA.299-300. That memorandum outlines what the Coast

4

Guard considers part of the vessel, and what the Coast Guard does not consider to be part of the vessel: in this memorandum, the Coast Guard introduced a concept wholly absent from the regulations, called outfitting. The memorandum does not cite the regulatory definition of hull or superstructure, but it does, at paragraph (f), decide that crane or mast houses are outfitting components instead of part of the superstructure. At paragraph (i), it decides cranes are part of cargo handling and stowage arrangements, so they are not included as hull structure. At paragraph (o), the memorandum concludes that legs on jack-up vessels are appendages instead of part of the hull or superstructure.

Applying that memorandum, the Coast Guard concluded the crane on the DB AVALON is not a structural part of the dredge above the main deck, and the spuds are not a part of the hull of the vessel. Instead of applying the considerable part test and the major component test, the Coast Guard exempted the crane and the spuds from those tests, concluding these parts of the vessel are neither hull nor superstructure. Instead, they are outfitting. The Coast Guard explained its reasoning, citing the memorandum:

> The crane, including its mounting ring, will be bolted to the Vessel's hull, not welded, and will be completely removable from the Vessel. The spuds will also be removable from the vessel. When removed, the Vessel will remain a complete and intact vessel and will be fully capable of operating as a vessel without the spuds and crane. As described, the spuds and crane would be considered outfitting and not part of the hull or superstructure of the Vessel.

ROA.286. So finding, the Coast Guard decided the DB AVALON "would be considered built in the United States for purposes of 46 C.F.R. § 67.97 and would not be considered rebuilt foreign pursuant to 46 C.F.R. § 67.177. As such, it will be eligible to be documented with a coastwise endorsement and, as such will be qualified to engage in the coastwise trades of the United States." ROA.287.

> 2. The district court found the Coast Guard's determination was entitled to *Auer* deference.

The Coast Guard publishes its approvals issued under 46 C.F.R. § 67.177, but not the applications. Diamond learned about the DB AVALON only because the dredge was being built right next to Diamond's yard in Amelia, Louisiana.  ROA.19. Diamond first appealed the NVDC's approval of the DB AVALON to the Coast Guard, but the Coast Guard did not respond. ROA.18.

The DB AVALON is an immediate and direct threat to Diamond's business. All Diamond's bucket dredges are built in the U.S., with U.S. cranes. Realizing the threat, Diamond filed suit in the Southern District of Texas, under the Administrative Procedure Act. Curtin and the Port of Houston Authority filed motions to dismiss, while the federal defendants filed an answer. Diamond and the federal defendants filed cross-motions for summary judgment. The pending motions were referred to the magistrate judge.

The magistrate judge issued a memorandum and recommendation, which recommended that Diamond's motion for summary judgment be denied, that

Curtin's motion to dismiss be granted, and that the federal defendants' motion for summary judgment be granted. ROA.584-610. Diamond had shown that the crane on the DB AVALON was a structural part above the main deck, and therefore the crane was a part of the superstructure, as defined in 46 C.F.R. § 67.3. Therefore, the crane cannot be exempted from the major component test. Diamond had further observed that the Coast Guard did not define "structural part": not in the regulations, not in the review criteria memorandum, not in its approval of the DB AVALON, and not in its briefing to the district court. But the report concluded that the Coast Guard had, in fact, defined structural part. Combining three different sections of the review criteria memorandum, the report said that "it seems that a structural part affects the vessel's structural integrity, thus when a component does not affect structural integrity, it is considered outfitting." ROA.608. Finding further that this definition is reasonable, the report recommended that *Auer* deference apply, and the federal defendants win. ROA.609.

Separately, the report recommended that Curtin's and the Port's motions to dismiss be granted. The report concluded that competitor standing under the APA is not the law in this Court. Diamond pled that it had standing under the APA because it cannot fairly compete with Curtin when Diamond uses more expensive (but legally compliant) domestic-built vessels, and Curtin uses a foreign-built crane. The report concluded this was inadequate. ROA.597.

7

Diamond timely objected to the report. ROA.611. Three days later, in a one-and-a-little-bit page order, the district court adopted the report and entered final judgment. ROA.635-36. This appeal timely followed. ROA.637.

## SUMMARY OF THE ARGUMENT

The Coast Guard concluded that the crane on the DB AVALON is not a part of the dredge for purposes of United States cabotage laws, and the district court afforded that conclusion *Auer* deference. Therefore, the crane can be built foreign. Even a cursory look at the dredge schematic, above, shows the error in that conclusion: the DB AVALON is called a crane barge, and its crane is the major part of the dredge: it is the part that does the dredging. For the DB AVALON to dredge, the barge is moved into place and it spuds down. Then the crane boom moves to the desired location, the crane drops its bucket, and scoops up dredge spoil. It then deposits the dredge spoil elsewhere. The crane is the part of the dredge that dredges, and the deck barge is a platform that allows the crane to dredge. The crane is a structural part of the dredge.

It would seem obvious that the crane on the dredge is a structural part of the dredge above the main deck. If the crane fell off the dredge into the Houston Ship Channel, everyone would know the dredge had suffered structural damage. Parsing the language of the regulations gives the same answer. 46 C.F.R. § 67.177(a) provides a vessel is rebuilt foreign "when a major component of the hull or

superstructure not built in the United States is added to the vessel." The superstructure is "the main deck and any other structural part above the main deck." 46 C.F.R. 67.3. "Structural part" is not defined, so plain meaning governs. A structural part is a necessary part of the structure, as opposed to decoration or fittings. There are broader definitions of structural part, but there is no reasonable definition of "structural part" that would carve out the crane part of a crane barge.

Because the crane is a structural part, it must pass the major component test: unless the crane weighs less than 1.5% of the steelweight of the dredge, it must be built in the United States. The crane on the DB AVALON was not subjected to the major component test (which it could never pass in any event on account of its size and weight), and it was built foreign. Therefore the DB AVALON is not built or rebuilt domestic and it cannot dredge in U.S. waters.

The Coast Guard came to a different conclusion. It found that if the crane is removed, "the Vessel will remain a complete and intact vessel and will be fully capable of operating as a vessel without the spuds and crane." ROA.331. The error in this approach is patent. First, the DB AVALON without the crane is a vessel, but it is not a dredge. Second, the Coast Guard's rationale fails to address, let alone explain, the definition of superstructure, or of structural part. Instead of requiring every major component of the hull and superstructure to be built domestic as the law and regulations require, the Coast Guard's approach allows the removal of anything

that, once removed, will still leave a vessel behind. It reads "superstructure" out of both the regulations and the statutes.

The district court would buttress this approach. The district court first found a definition of structural part, cobbling together three separate parts of the Review Criteria Memorandum to do so. The district court's definition of structural part is this: "it seems that a structural part affects the vessel's structural integrity, thus when a component does not affect structural integrity, it is considered outfitting. [. . .] When outfitting can be removed from the vessel, like here, and does not affect the structural integrity of the ship, like here, it is not a structural part, thus the vessel's superstructure is not implicated." ROA.608. Then, having created a definition for structural part, the district court next found its definition and the dictionary definition both to be reasonable. Believing there were two reasonable definitions, but without reference to the plain meaning of the words or the dictionary, the district court applied *Auer* deference. And once *Auer* deference applied, the answer was clear.

The district court's approach is not consistent with *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019). Courts are not at liberty to come up with a justification, or a definition, that the agency itself has not offered. Fatally, the district court's definition does engage with the actual meaning of the words. Plain meaning is the lodestar of regulatory and statutory interpretation. Applying plain meaning here shows there is no ambiguity. "Any structural part" includes the dredging part of a dredge.

10

Assuming ambiguity, the next step is textual analysis. The district court did not open, let alone exhaust, its interpretive toolkit. The district court's definition of "any other structural part above the main deck" as "anything that, when removed, still leaves a structurally-intact vessel behind" would allow removal of everything above the main deck, collapsing the definition of superstructure into the definition of hull, reading superstructure out of both the regulation and the statute.

Separately, the district court erred in holding that Diamond does not have standing against its competitor, Curtin. The Administrative Procedure Act has a presumption in favor of review of agency action. Every circuit that has addressed the issue has found competitor standing under the APA, and every court that has reviewed a Coast Guard determination of a vessel's compliance with regulations has found standing.

## STANDARD OF REVIEW

1. <u>Summary Judgment</u>

A grant of summary judgment is reviewed de novo, applying the same standard applied by the district court. *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 605 (5th Cir. 2010). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Brackeen v. Haaland,* 994 F.3d 249, 290 (5th Cir. 2021) (*en banc*) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). In reviewing the record, this Court views "all the facts and evidence in the light most favorable to the non-movant." *Ortega Garcia v. United States,* 986 F.3d 513, 524 (5th Cir. 2021).

2. <u>Review of agency action</u>

When a regulation is clear, it should be interpreted according to its plain language. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019). If uncertainty does not exist, there is no plausible reason for deference: the Court must give effect to the regulation as it is written. Before determining a regulation is ambiguous, this Court must exhaust all its traditional tools of interpretation. *Id.*, citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, n. 9 (1984). "Only when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is more one of policy than of law." *Kisor*, 139 S.Ct. at 2415, citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991) (cleaned up).

If genuine ambiguity remains after this Court has exhausted its interpretive tools, the agency's reading must still be reasonable. *Id.* at 2415-16. That is, it "must come within the zone of ambiguity the court has identified after employing all its

interpretive tools." *Id.*, citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

If ambiguity remains and the agency's reading is reasonable, that reading is only entitled to deference if it meets three criteria. First, the interpretation must be the agency's authoritative, official position, instead of an ad-hoc statement. Second, the interpretation must implicate the agency's substantive expertise. Third, the agency's reading must reflect a fair and considered judgment. *Id.* at 2416-17. An agency cannot, "under the guise of interpreting a regulation, create *de facto* a new regulation." *Id.* at 2415, citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000).

## ARGUMENT

1. The history of the Foreign Dredge Act, its implementing regulations, and judicial review of Coast Guard build and rebuild determinations.

### a. The Foreign Dredge Act and its implementing regulations

The Foreign Dredge Act is the lesser-known, older sibling to the Jones Act. The Foreign Dredge Act was passed in 1906, then re-authorized in 2006. Under the Foreign Dredge Act, a dredge may engage in dredging in the navigable waters of the United States only if it has been issued a certificate of documentation with a coastwise endorsement. 46 U.S.C. § 55109(a)(3). To be entitled to a certificate of documentation with a coastwise endorsement, a vessel must be built in the United

States, 46 U.S.C § 12112(a)(2)(A), and if it is rebuilt, it must be rebuilt in the United States. 46 U.S.C. § 12132(b). To be rebuilt in the United States means that "the entire rebuilding, including the construction of any major component of the hull or superstructure, was done in the United States." 46 U.S.C. § 12101(a).

Historically, "entire" has always had a few gaps, introduced through regulations at 46 C.F.R. § 67.97 (for builds) and 46 C.F.R. § 67.177 (for rebuilds). The former provides that a vessel is built in the United States when both (a) all major components of its hull and superstructure are fabricated in the United States, and (b) the vessel is assembled entirely in the United States. Rebuilds are a little more complicated. Coast Guard regulations provide two tests to determine whether a vessel has been rebuilt foreign: the major component test, and the considerable part test. 46 C.F.R. § 67.177 provides that "a vessel is deemed rebuilt foreign when any considerable part of its hull or superstructure is built upon or substantially altered outside the United States." Separately, at (a), the regulation adds that "[r]egardless of its material of construction, a vessel is deemed rebuilt when a major component of the hull or superstructure not built in the United States is added to the vessel." These are known as the considerable part test, and the major component test.

The considerable part test is spelled out in the regulation: a steel or aluminum vessel is deemed rebuilt foreign when a considerable part of the vessel is changed in a foreign shipyard. 46 C.F.R. § 67.177(b). If the work performed constitutes more

14

than 10% of the steelweight of the vessel, then the vessel has been rebuilt foreign. If the work performed is less than 7.5% of the steelweight of the vessel, then the vessel has not been rebuilt foreign. Between 7.5% and 10%, the Coast Guard has discretion to say whether it is a rebuild or not.

Though the major component test is referenced in the regulations, its contours are outlined not in the regulations but in memoranda. A major component is defined in memoranda as a "new, separate and completely-constructed unit weighing more than 1.5% of the vessel's steelweight." See *Shipbuilders Council of America v. United States Coast Guard*, 578 F.3d 234, 243 (4th Cir. 2009); ROA.542.

The two regulations work in concert. If something is a separate and completely-constructed unit, like a crane, it is evaluated under the major component test. On the other hand, if a vessel is, say, getting multiple inserts to replace old or weakened steel in the hull and bulkheads, that would fall under the considerable part test because those parts are not separable. ROA.541-42.

Congress amended the U.S. cabotage laws in 1956 and 1960, passing the Second Proviso to the Jones Act, which was intended to strengthen the Act's protections. The Jones Act and Foreign Dredge Act were then recodified in 2006 without material change. The Coast Guard promulgated the considerable part test in 1957, then added the major component test in 1960. The regulations create a process to apply to the Coast Guard for a foreign rebuild determination, under 46 C.F.R. §

67.177(g), in which the vessel owner can submit plans to the Coast Guard for a rebuild and the Coast Guard will issue an opinion letter, saying whether that rebuild is foreign or domestic. That is the process under which Curtin sent correspondence to the NVDC, ROA.337-42, and the NVDC responded, ROA.330-32.

Whether built or rebuilt, the statute and the regulations require major components of the hull and the superstructure to be built domestic. 46 U.S.C. § 12101; 46 C.F.R. § 67.97; 46 C.F.R. § 67.177(a). The Coast Guard has defined both hull and superstructure. Hull is "the shell, or outer casing, and internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." Superstructure is "the main deck and any other structural part above the main deck." 46 C.F.R. § 67.3.

> b. *When the Coast Guard strays from the text of its regulations, courts correct the error.*

Coast Guard interpretations of these regulations have been subject to judicial challenge. When the Coast Guard has followed its regulations, its interpretations have been upheld. When the Coast Guard has not followed its regulations, its interpretations have not been upheld.

The lead case, *Shipbuilders Council of America v. United States Coast Guard*, 578 F.3d 234 (4th Cir. 2009), involves a facial attack on the considerable part test. OPA-90 requires oil tankers to have a second skin, the better to prevent spills. Seabulk's tanker, the TRADER, already had part of an internal hull, but it needed

more to become OPA-90 compliant, and it had the remainder of its second skin added in a shipyard in China. Completion of the second, interior hull amounted to 8.15% of the TRADER's pre-modification steelweight. The work was performed under the considerable part test because the addition to the hull was not a separable component. Shipbuilders argued that the addition of a separate, interior hull was a major component, and further, the Coast Guard's separable/inseparable distinction, not in the published regulations, was nonsense. The Coast Guard countered that without some distinction between a major component and a considerable part, the two tests would end up collapsing into just the major component test. *Id.* at 241.

After a thorough review of the law and regulations, the Fourth Circuit gave only *Skidmore* deference to the Coast Guard. *Id.* at 243. Seabulk's argument would have done away with the considerable part test, leaving only the major component test. But the Fourth Circuit reasoned that the considerable part test is in the published regulation, and regulation should be read coherently without rendering any of part to be superfluous. *Id*. at 244-45. That is particularly so when the considerable part test predates the major component test. Reading the considerable part test out of the regulation didn't follow, and Seabulk's challenge failed.

The Fourth Circuit cited with approval *American Hawaii Cruises v. Skinner*, 713 F.Supp. 452 (D.D.C. 1989). There, American Hawaii Cruises challenged the issuance of a coastwise endorsement to the S/S MONTEREY on the basis that it had

been rebuilt foreign. The owners applied to the Coast Guard, asking the agency to authorize work to be performed in Finland on a cruise ship. The Coast Guard agreed, finding that the work was "overwhelmingly nonstructural in nature." *Id.* at 465. Explaining the distinction between structural and nonstructural, the Coast Guard offered that nonstructural changes are "mere cosmetic or aesthetic changes," which do not constitute a rebuild. *Id.* at 165-66. On that rubric, it did not matter that of the rebuild, $30 million would be done in Finland and $5 million in the United States: the Coast Guard explained that the nature of the work, not the cost, is key.

After a lengthy review of prior Coast Guard administrative decisions and a close look at the language, the court rejected the Coast Guard's argument, sending approval of the S/S MONTERREY back to the Coast Guard with instruction to come up with a better test, and a better explanation. The court found the Coast Guard's proffered structural versus nonstructural distinction to be "so vague that the Court cannot adequately perform its task of judicial review under the APA." *Id.* at 468. The would-be test did not address the language of the second proviso. Further, the Coast Guard's test was more honored in the breach than in the observance: with regard to the S/S MONTERREY, the Coast Guard had said that structural work must be performed in the U.S., but it made an exception for *de minimis* structural changes in Finland. The Coast Guard, the court explained, had not come up with a permissible construction of the second proviso to the Jones Act. *Id.* at 469.

18

Close to *American Hawaii* geographically, temporally, and logically, is *Keystone Shipping Co. v. United States*, 801 F.Supp. 771 (D.D.C. 1992). Seabulk built the SEABULK AMERICA out of two other vessels: the FUJI, a tanker built in Japan, and the Barge 4102, a foreign tanker. Seabulk applied for a coastwise permit on the basis of the Wrecked Vessel Act, which allows any vessel wrecked in United States waters and purchased by a United States citizen to be used in domestic trade, if the repairs are (a) triple the salvage value of the vessel, and (b) performed in a United States shipyard. See 46 U.S.C. § 12107; 46 U.S.C. § 67.133.

The barge was a wreck, but it did not meet the criteria of the Wrecked Vessel Act. The FUJI was a wreck too, but it did meet those requirements. If the whole thing were the FUJI rebuilt, then the new vessel could have a coastwise endorsement. If it were the Barge 4102 rebuilt, it could not. The court found itself "unable to satisfactorily review the Coast Guard's decision." The factors given by the Coast Guard in determining the new vessel was really the FUJI were "plucked out of the water, and in some ways contrary to the decisions which govern rebuild decisions under the Jones Act." *Id.* at 782-83. The court remanded to the Coast Guard for a fuller explanation of its decision under the Wrecked Vessel Act.[2]

---

[2] The Second Circuit addressed a similar issue and reached the same conclusion as the *Keystone* court (only remanding for trial, instead of remanding to the Coast Guard) in *Marine Carriers Corp. v. Fowler*, 429 F.2d 702 (2d Cir. 1970).

Finally, *Philadelphia Metal Trades Council v. Allen*, C/A No. 07-145, 2008 WL 4003380 (E.D. Pa. Aug. 21, 2008), decided one year before *Shipbuilders*. Aker was building a series of tankers, using "certain foreign-built engine room-related macro modules." *Id.* at *6. The Coast Guard gave Aker the go-ahead, finding that propulsion machinery and the line – items not integral to the hull or superstructure – do not affect a U.S. build determination.

The plaintiffs challenged the determination. 46 C.F.R. § 67.97(b), regarding new builds, provides that the vessel must be assembled entirely in the United States. The plaintiffs argued that the macro modules were assembled foreign, citing Webster's and the American Heritage Dictionary. The Coast Guard cited the same dictionaries, but focused on the meaning of "parts" and "assembly" – the *vessel* must be assembled in the United States, argued the Coast Guard, but that doesn't mean every component part must be assembled in the United States, or the regulation would have said that all the vessel's parts must be assembled in the United States. The plaintiffs' argument meant every nut or bolt or circuit incorporated into a vessel must be assembled entirely in the United States. *Id.* at *10. In light of two plausible interpretations, the court found the regulation ambiguous, and the Coast Guard's reasonable interpretation won.

2. The Coast Guard's approval of the DB AVALON is unmoored from the text of the regulations.

a. *The crane is a structural part of the superstructure.*

The superstructure of a vessel is the main deck, and any other structural part above the main deck. 46 C.F.R. § 67.3. The crane on the DB AVALON is a structural part of the vessel above the main deck. Therefore, the crane is a part of the superstructure. Unless the crane can pass the major component test because it weighs 1.5% or less of the steelweight of the vessel, then the addition of the crane makes the DB AVALON a foreign build or rebuild. The dredge cannot dredge on American navigable waters. It is not entitled to a certificate of documentation with a coastwise endorsement.

There are broader and narrower definitions of the term "structural part," but all of them encompass the crane on the DB AVALON. On the broad side is Merriam Webster, which defines structural as "relating to, or affecting structure." Structure is "something (such as a building) that is constructed." (11th ed. 2019). Black's Law Dictionary defines structure as "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together." (11th ed. 2019).

The Oxford English Dictionary is narrower: "structural" is "[f]orming a necessary part of the structure of a building or other construction, as distinct from its decoration or fittings." 6th ed, Oxford University Press, 2007.

Between the broad and narrow definitions, the narrower Oxford English Dictionary definition is better. The regulation references structural parts, not just parts. Structural parts presuppose nonstructural parts. Unlike Merriam-Webster, the OED definition delineates that not all parts are structural. Structural parts are different from decorations or fittings, which are nonstructural. The crane is a necessary part of the dredge. It is not a decoration or fitting. The crane is structural.

The OED definition also fits the history and purpose of the regulation, including the Coast Guard's own definition. The regulatory definition was enacted after, and in response to, *American Hawaii*, through notice-and-comment rulemaking. In *American Hawaii*, the Coast Guard argued that a foreign rebuilding was acceptable because the regulations, as applied, "require substantial structural alterations before the work will be considered a rebuilding. Mere cosmetic or aesthetic changes, non-structural in nature, do not constitute a rebuilding." 713 F.Supp. at 465-66. The matter was remanded to the Coast Guard, with instruction to come up with material definitions. So instructed, the Coast Guard regulated and defined superstructure: the main deck, and any structural part above it. We know what is excluded from the superstructure because we know what the Coast Guard intended to exclude from the superstructure from *American Hawaii*: structural parts are those that are more than simply cosmetic or aesthetic.

The OED definition also has the support of the only court to look at the issue in detail – the Eleventh Circuit, in *Hegel v. First Liberty Ins. Co.*, 778 F.3d 1214, 1222 (11th Cir. 2015). The plaintiff had an insurance policy that covered structural damage. The district court ruled that structural damage is any physical damage to the structure, but the Eleventh Circuit reversed. Citing the OED, it held that all damage is physical damage, so structural damage must be different from just physical damage. Instead, structural damage to the building means "damage that impairs the structural integrity of the building." *Id.* at 1222, citing with approval *Gonzalez v. Liberty Mut. Fire Ins. Co.,* 981 F.Supp.2d 1219, 1231 (M.D. Fla. 2013).

The comparison is straightforward. Assume the DB AVALON had a hull and machinery policy that covered only structural damage to the vessel. Assume further that the crane boom collapsed, or the whole crane slid into the Houston Ship Channel in the middle of operations. Woe be unto the underwriter that would deny coverage for want of structural damage to the barge. In the lawsuit that would follow, it would be obvious to everyone that the dredge had suffered structural damage. After all, the dredge could no longer do what it exists to do.

A structural part is distinct from decorations and fittings. The crane on the DB AVALON is, assuredly, not a decoration. The OED defines a fitting as "a small part on or attached to a piece of furniture or equipment"; Mirriam-Webster calls it "a small often standardized part." The crane is not a fitting either. The crane is the crane

23

part of the crane barge; it is what makes the DB AVALON a dredge. The remainder of the vessel is just a platform to allow the crane to operate on navigable waterways. Because the crane is a structural part above the main deck, as opposed to a decoration or fitting, and because it is separable, it is a part of the superstructure and must be evaluated under the major component test. The Coast Guard's failure to do so here was plainly wrong.

In addition to comporting with the actual meaning of the words of the regulation, finding that the crane on a dredge is a structural part of the superstructure of the dredge meets common sense. As Diamond has been at pains to point out, if Curtin took away the crane, the DB AVALON is now a very peculiar spud barge. The schematic for the dredge, ROA.343, shows that the crane is easily the largest component of the dredge above the main deck or below. Where the statute and the regulations require the construction of any major component of the superstructure of the dredge to be in the United States, it follows that the largest part of the dredge is, in fact, a major component of the dredge.

> b. *The Coast Guard's approval of the DB AVALON does not engage with the text of the Coast Guard's regulations.*

When Curtin applied to the Coast Guard for approval for their dredge despite a foreign-built crane and foreign-built spuds, the Coast Guard's response merited one paragraph, including only one sentence of analysis. The Coast Guard wrote:

The crane will be a full circle slewing, luffing jib type crane, able to perform rock breaking and dredging work. The crane, including its mounting ring, will be bolted to the Vessel's hull, not welded, and will be completely removable from the Vessel. The spuds will also be removable from the vessel. When removed, the Vessel will remain a complete and intact vessel and will be fully capable of operating as a vessel without the spuds and crane.

As described, the spuds and crane would be considered outfitting and not part of the hull or superstructure of the Vessel. I refer you, in general, to the Review Criteria Memorandum posted on the NVDC website and to its subparagraphs e) and i), in particular. As outfit, and not part of the Vessel's hull or superstructure, their foreign source and construction will not be an impediment to the qualification of the Vessel to be documented with a coastwise endorsement as a vessel built in the United States.

ROA.331. The Review Criteria Memorandum is at ROA.334-35. The NVDC referenced the memorandum, so the memorandum should be treated as incorporated by reference.[3]

Sub-paragraph (i) addresses cargo handling and stowage arrangements. This sub-paragraph provides that winches, booms, kingposts, cranes, etc, "are outfitting items and not included as hull structure." The Coast Guard perhaps should have cited sub-paragraph (f), which provides: "Superstructure: includes portions of the hull extending above the freeboard deck, such as forecastles. Also includes deckhouses

---

[3] The Coast Guard referenced two sub-parts of the Memorandum to justify its decision: (e) and (i). Sub-paragraph (e) of the Memorandum addresses sponsons and floats. Presumably, the Coast Guard referenced sub-paragraph (e) with regard to the dredge's foreign-built spuds, even though spuds are neither sponsons nor floats, nor particularly close to either. Sub-paragraph (o) addresses jack-up legs. Spuds are not jack-up legs, either, but they are closer to that than to sponsons or floats.

and pilothouses, but not breakwaters, crane or mast houses, or ventilation or exhaust trunks (those being outfitting components.)" ROA.344.

The memorandum and its approval of the Curtin dredge constitute the entirety of the Coast Guard's analysis of the issue. In the memorandum, the Coast Guard repeatedly declares that major parts of the vessel are outfitting. Unlike hull and superstructure, outfitting is not a defined term, and the memorandum does not define the term. Instead, the Coast Guard opines that certain significant components of the vessel are outfitting and therefore, for regulatory purposes, not part of the vessel. Patent from the face of the memorandum, though, is a profound narrowing of what parts of a vessel need to be built domestic. That narrowing was done without rulemaking. It was also done without analysis of the regulatory text. For instance, the memorandum states that cranes are not part of the hull. It never asks whether cranes are a part of the superstructure.

> c. *As applied to the crane on the DB AVALON, the memorandum contradicts the regulations.*

The memorandum fails to cite, or engage with, the published regulatory definition of superstructure. There is no analysis of whether something is a structural part, much less why. The definition of superstructure is not cited, and though the term "structural integrity" appears – taken from the regulatory definition of hull – the term "structural part" is unmentioned. The only part of the superstructure of a

vessel that the memorandum affirmatively includes as part of the vessel are (a) parts of the hull; and (b) deckhouses and pilothouses.

In application, the Coast Guard's commitment to the idea that deckhouses and pilothouses are part of the superstructure was short-lived: In 2013, the Coast Guard concluded that an operator's cab – a type of deckhouse – would not form part of the superstructure of a vessel because it is "essentially a weather-sheltered operating station, functionally equivalent to the enclosed cab of a large crane." ROA.439.[4] In 2019, in response a request, the NVDC held that the permanent addition of Portable Accommodation Modules – PAMs are a type of deckhouse that provides living quarters or office space to vessels (only here they were permanent rather than portable) – are not components of the vessel either. ROA.479. The Coast Guard so reasoned because PAMs do not "contribute to the vessel's hull strength or structural integrity," and because they are "outside the vessels' floatation envelope." ROA.479.

The memorandum further contradicts the Coast Guard's prior positions, and separate regulations. When the Coast Guard's regulatory schema was challenged in *Shipbuilders*, the Coast Guard mounted a full-throated defense, and an explanation not just of the considerable part test at issue in that case, but the whole system.

---

[4] The Coast Guard did not include a schematic of the vessel at issue, an Amphibex 400, which is available here: https://amphibex.com/models/ae-400/.

ROA.510-70. In an exhaustive description of the considerable part test and the major component test, there is no mention of outfitting. There is no conception that something could be a part of the vessel and not subject to the considerable part test or the major component test either. To the contrary, the Coast Guard states that "[i]n assessing foreign work under the 'major component' test, the Coast Guard looks to whether a separate, completed structure has been constructed and then affixed to the vessel." Explaining, the Coast Guard told the Fourth Circuit that "[t]his interpretation embodies the plain meaning of the prohibition against the foreign 'construction' of 'major components' being added to the vessel." ROA.548

There is a reference to outfitting in the Federal Register. 60 Fed. Reg. 17290 (April 5, 1995). In a notice of proposed rulemaking and request for comment, the Coast Guard references outfitting once, providing a list of outfitting and maintaining work that would not be a part of the hull or superstructure. *Id.* at 17815. There are thirty listed items identified as outfitting or maintenance. Of the thirty, fourteen are examples of installation, versus sixteen listed as renewal, cleaning, or otherwise presumably maintenance. Of the fourteen types of installation that would reasonably be considered outfitting, the largest are (a) windows and portholes; (b) interior stairs (but even there the stairway trunks must be built in the United States); and (c) lounges, cabins, and restrooms. This rulemaking was in direct response to the D.C.

Circuit's ruling in *American Hawaii*. ROA.533.[5] It is not accidental that the work considered in the proposed rule as outfitting and maintenance involves the installation of little, nonstructural furnishings – the Coast Guard proposed a rule that substantiated its position in *American Hawaii* that mere cosmetic, nonstructural changes in the vessel do not constitute a rebuilding.

In this one reference to outfitting, all fourteen examples are nonstructural. More noteworthy is what is absent from the federal register: there is no reference to cranes. There is no reference to any major equipment. This follows, because major equipment is structural. It beggars belief to think that the Coast Guard meant to include the crane on a crane barge as mere outfitting when it was regulating, but when listing items of outfitting in proposed rulemaking, included only portholes, prefabricated bathroom modules, and twelve other insignificant, nonstructural elements.

Is the crane on the DB AVALON a structural part? The question answers itself. If more were needed, the Coast Guard's own regulations provide the answer at 46 C.F.R. § 173.005 *et seq*. This suite of regulations applies to certain vessels with cranes, including bucket dredges. The regulations reference a maximum heeling moment due to a hook load on the crane – how much the vessel will heel when the

---

[5] Explaining to the Fourth Circuit: "The Coast Guard responded to the district court decision in *American Hawaii Cruises* by undertaking an extensive notice and comment rulemaking."

crane is under load. There is a formula that determines how big the crane is under load relative to the displacement and the beam (i.e. width) of the vessel. The reason is straightforward: if a large crane with a large load suffers catastrophic failure, the vessel is at risk of capsizing. The bigger the crane, the less beam, and the less displacement, the greater the risk of capsizing. Non-counterballasted vessels like the DB AVALON must show that the crane, under load, meets specific stability criteria at 46 C.F.R. § 173.020. This is all compiled into a stability booklet that lays out the load limits for the crane. The crane is so significant, structurally, to the operation of the dredge that it has precise regulations tailored to ensure its safety.

### d. The memorandum does not consider dredges.

The memorandum changes definitions in the guise of interpretation. But the memorandum, no matter how closely-read, does not pass judgment on the role of a crane on a bucket dredge and therefore should not have been applied to the DB AVALON in the first instance. At paragraph (i), the memorandum references cranes not as part of dredges but as part of cargo handling and stowage arrangements. The ordinary cargo vessel with a deck crane steaming into the port of New Orleans is a cargo vessel first, and the crane is used, occasionally, in cargo operations. The vessel does not need a stability booklet because the crane is, comparatively, insignificant. The crane on the DB AVALON is not there to handle cargo or stowage. It is the part of the dredge that makes it a dredge instead of a spud barge.

30

The Coast Guard, in applying the memorandum to the DB AVALON, did not stop to ask whether allowing cranes for cargo purposes should extend to cranes on bucket dredges, where the crane is the whole motive part of the vessel. If it would have considered the DB AVALON in full, the Coast Guard would have realized the difference. The Coast Guard explained to the district court that the major component test "was intended to prevent the insertion of a single, completed component into a vessel, rather than to address the addition of items that constitute mere outfitting." ROA.322. Maybe a cargo-handling crane on a cargo vessel is insignificant. There is nothing mere about the crane on the DB AVALON.

3.  Under *Kisor*, the Coast Guard is not entitled to deference.

    a.  *The district court is not at liberty to rescue an agency's inadequate process.*

The superstructure of a vessel is the main deck, and any structural part above the main deck. The Coast Guard does not define "structural part." Not in its briefing to the district court; not in its correspondence to Curtin; and not in its Memorandum. The Coast Guard did not claim to have defined structural part either.

The district court found a definition for the Coast Guard. The district court, citing to paragraphs (g), (e), and (i) of the Memorandum, reasoned:

> [I]t seems that a structural part affects the vessel's structural integrity, thus when a component does not affect structural integrity, it is considered outfitting. When outfitting can be removed from the vessel, like here, and does not affect the structural integrity of the ship, like

31

here, it is not a structural part, thus the vessel's superstructure is not implicated.

ROA.608. Explaining further, the district court held: "simply put, the Coast Guard explains that the terms 'major component' and 'structural part' are not implicated because the crane and spuds are equipment which does not affect the operation of the DB AVALON as a vessel, so they are considered outfitting." ROA.606.

Having created a definition for the Coast Guard, the district court next concluded that both Diamond's interpretation, relying on the plain meaning of the words, and the Coast Guard's interpretation, cobbled together from the Memorandum, are reasonable.[6] With two reasonable interpretations of an ambiguous regulation, the Coast Guard wins.

The district court's analysis is not the Coast Guard's. The Coast Guard did not define structural part, and the district court is not free to create a justification. "Courts must focus on the justifications expressed by the agency at the time of its ruling." *Burhathoki v. Nielsen*, 898 F.3d 504, 515 (5th Cir. 2018). If the agency's process or analysis is lacking, "the reviewing court should not attempt itself to make up for such deficiencies; [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (cleaned up).

---

[6] The district court held: "The Court finds that the regulation is ambiguous because neither Plaintiff's interpretation nor the Coast Guard's interpretation is the only reasonable interpretation, so the Court will analyze if the Coast Guard's interpretation is plainly erroneous or inconsistent with the regulation."

b. *The district court's definition fails to apply the plain meaning of the words.*

If the issue were the Coast Guard's brief process and inadequate definition of terms, then remand to the Coast Guard for further work would be appropriate. Here though, no amount of process can save the Coast Guard's conclusion because the district court's definition, and the Coast Guard's practice, cannot be squared with the plain meaning of the words "structural part." Plain meaning is the beginning and end of the inquiry. See *Nat'l Ass'n of Mfrs. v. Dept. of Def.*, 138 S.Ct. 617, 631 (2018) (holding that when "plain language is unambiguous, the court's inquiry begins with the statutory text, and ends there as well.") (cleaned up). Ordinarily, to intuit the plain meaning of non-technical words, courts start at dictionaries. See e.g. *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) ("Dictionaries are a good place to start to identify the range of meaning that a reasonable person would understand [. . .]"). Shown above, the plain meaning of "any structural part" includes the crane on the DB AVALON.

The district court instead defined a structural part as something that, when removed, still leaves the vessel as a functioning vessel – even if it is a very different type of vessel. This definition fails because it does not define the words. It is a justification, not a definition. The category of still-a-vessel is not narrow: a vessel is "every description of watercraft or other contrivance capable of being used as a means of transportation on water, but does not include aircraft." 1 U.S.C. § 3; 46

C.F.R. § 67.3. The "is it still a vessel" test does not work as an application of the law or the regulations – it would allow foreign build of nearly everything on a vessel. Under that test, neither the roof nor the front door is a structural part of a house: remove them, and there is still a house – just a little draftier.

### c. *The district court did not open, let alone exhaust, its interpretive toolbox.*

If the term "structural part" were ambiguous when looking at its plain meaning, that is only the beginning of the *Kisor* inquiry, not the end. Textual analysis should follow. If there were any ambiguity here, textual analysis shows the way.

The definition of hull is "the shell, or outer casing, and internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." 46 C.F.R. § 67.3. The district court and the Coast Guard have read superstructure to overlap entirely with hull. That cannot be. The Coast Guard, regulating, used different words to define hull and superstructure, which follows – they are different parts of the vessel with different roles and characteristics. If the Coast Guard had wanted to use the same definition for hull and superstructure, it would have used the same words to define both.

Defining superstructure to coincide with hull further fails because it renders "superstructure" superfluous. A regulation should be read to give effect to all its provisions, so that no part will be inoperative, superfluous, void, or insignificant. See *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citing Singer, Statutes and Statutory

34

Construction § 46.06, pp. 181-186 (rev. 6th ed. 2000)). With the district court's definition, answering whether something is a part of the hull (it is part of the floatation envelope and structural integrity of the vessel) already answers whether it is part of the superstructure (it is required for the structural integrity of the vessel).

By the district court's definition, the DB AVALON has no superstructure. The crane has been discussed, but the DB AVALON has a control tower too. Under plain meaning (or looking at the schematic), one would think the crane and the control tower would comprise the great weight of the superstructure of the dredge. This control tower was built domestic, removed from an existing vessel and put on top of the deck barge. ROA.331. It need not have been built domestic – and if the district court's opinion is upheld, the next will not be – because the district court's test would make the control tower outfitting too. The control tower is not part of the superstructure of the vessel: once removed, it leaves the DB AVALON still a vessel. It is not part of the structural integrity of the vessel, nor is it a part of the floatation envelope. Applying the district court's test, it is outfitting.

This is hardly some imagined horror. The Coast Guard has already collapsed hull and superstructure into one inquiry instead of two, shown in the record. The Coast Guard found that Portable Accommodation Modules were not a part of a vessel's superstructure because they "would be outside the vessels' floatation envelope. As such, they would not be considered components of the hull or

superstructure." ROA.479.   The Coast Guard said the same thing to Amphibex, ROA.437-40, holding that a control tower is not a part of the superstructure because it is similar to a crane cab.

Hull and superstructure cannot be the same thing, not just because they have different regulatory definitions. They also appear as separate concepts throughout the regulations, and in the statute: 46 U.S.C. § 12101 "[. . .] including the construction of any major component of the hull or superstructure"; 46 C.F.R. § 67.97, "[. . .] all major components of the vessel's hull and superstructure"; 46 C.F.R. § 67.177(a) "[. . .] major component of the hull or superstructure." Congress has required that the superstructure be built domestic. The Coast Guard cannot end the inquiry by looking only at the hull.

  d.  Kisor *means what it says.*

If structural part were ambiguous, there is a process to resolve that ambiguity, outlined above. The administrative agency's interpretation must then be reasonable, within whatever zone of ambiguity remains, after application of textual analysis. The district court did not purport to undertake that analysis.

 The district court's process is just what *Kisor* set out to stop. The *Kisor* court was not subtle. "We cannot deny that Kisor has a bit of grist for his claim that *Auer* bestows on agencies expansive, unreviewable authority." *Id*. at 2415 (cleaned up). The comment was not meant as praise of those decisions. As examples of how *Auer*

deference is not supposed to work, the Court cited cases where courts have "applied *Auer* deference without significant analysis of the underlying regulation," (citing *United States v. Larionoff*, 431 U.S. 864, 872 (1977)) and cases where it has "given *Auer* deference without careful attention to the nature and context of the interpretation," (citing *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 276 (1969)). Continuing, the Court held that "in a vacuum, our most classic formulation of the test – whether an agency's construction is plainly erroneous or inconsistent with the regulation —may suggest a caricature of the doctrine, in which deference is reflexive." *Kisor*, 193 S.Ct. at 2414-15. *Kisor* puts a stop to reflexive deference.

Federal appellate courts, including this Court, have faithfully applied *Kisor* by looking at plain meaning, then opening an interpretive toolbox to limit ambiguity and reflexive deference. The district court cited a case from this Court, *Johnson v. BOKF Nat. Ass'n*, 15 F.4th 356 (5th Cir. 2021), post-dating *Kisor* but still affording deference. This Court did find ambiguity and gave deference to the agency. But it found ambiguity because the regulation was ambiguous and textual analysis did not solve the issue. The Office of the Comptroller of the Currency defines interest as "any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended." 12 C.F.R. § 7.4001(a). Whether an overdraft charge is interest (because the bank is, in effect, extending credit to the

account-holder) or whether it is a non-interest charge or fee (because the account-holder is being charged for spending more than she has in her account) is not an easily-answered question. But this Court did not invent a definition for the OCC then throw its hands up in confusion. Instead, it applied all traditional tools of construction. *Id.* at 362-65. Only upon finding ambiguity did it defer to the agency, and that deference was limited.

*BOKF* stands out for finding ambiguity. The opposite is commoner. Diamond will not belabor the point with a string cite of cases after *Kisor* resolving seemingly thorny interpretive questions by applying the dictionary definition of the words. The examples are too many. In *Kisor* itself on remand, the Federal Circuit cited the dictionary and sussed out the meaning of "relevant," surely a more difficult task than "structural part." *Kisor v. McDonough*, 995 F.3d 1316, 1324 (Fed. Cir. 2020). This Court has, for good reason, called *Auer* deference "zombified" in light of *Kisor*, and it has not hesitated to reverse when courts have too easily deferred to agencies. *See Schofield v. Saul*, 950 F.3d 315, 322 (5th Cir. 2020).

Applying the same *Auer* case law that the *Kisor* court criticized, courts looking at vessel approvals still closely examined the plain meaning of the regulations at issue. In *Philadelphia Metal Trades Council*, the district court held that "[v]irtually by definition, an appropriate source for obtaining the plain and ordinary meaning of a word or phrase is an English language dictionary." 2008 WL

4003380 at *21, citing *U.S. v. Lachman*, 387 F.3d 42, 51 (1st Cir. 2004). In *Shipbuilders*, the Fourth Circuit opened its interpretive toolbox to determine the rebuild was properly under the considerable part test. Like the Coast Guard here collapsing "hull and superstructure" into "just the hull," the plaintiffs there sought to collapse the major component and considerable part tests into just the major component test. The Fourth Circuit realized its obligation "to give effect to all operative portions of the enacted language, including its 'every clause and word.'" *Shipbuilders*, 578 F.3d at 244, citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

### f. There is no history of allowing foreign-built cranes on dredges.

The Coast Guard urged, and the district court agreed, that the Coast Guard has long had flexibility in interpreting cabotage laws, ROA.606, citing foreign-sourced electrical equipment and engines. Shown in depth above, the Coast Guard regulations give it flexibility.

In particular, the district court cited *Philadelphia Metal Trades* for the proposition that large equipment modules are not part of the vessel because they are only outfitting. The equipment modules in *Philadelphia Metal Trades* were not considered to be outfitting. These modules were in the engine room. *Id.* at *6; n. 20. Unlike the crane, engine room components are plainly not part of the hull or superstructure.

The engine room is below the main deck. Although it is certainly a structural part of the vessel – it provides the propulsion – it is not a structural part of the vessel above the main deck. Therefore an engine room module is not superstructure. The hull is "the shell, or outer casing" of the vessel, along with the "internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." Neither an engine nor an engine room module is a part of the hull. They are parts of the vessel, but they are not parts of the hull or the superstructure. They can be built foreign.

This is not an accident. The Coast Guard did not forget to regulate vessel engines or engine room modules. Instead, when the Coast Guard wanted to exempt something major from the vessel – something that makes the vessel what it is; something necessary for the vessel's role and purpose – it writes the regulations carefully to do that. It did that with engines and engine room modules. The Coast Guard did no such thing with cranes. Here, unlike with engine room modules, the Coast Guard has contradicted the plain language of its regulations.

4. <u>The DB AVALON's Certificate of Documentation should be revoked.</u>

Congress requires that the major components of a vessel's hull and superstructure be built domestic. The Coast Guard's longstanding regulations require that the major components of a vessel's hull and superstructure be built domestic. The superstructure is the main deck and any structural part above the main

deck. The crane on the DB AVALON is a major component of the dredge's superstructure: it is a structural part of the dredge above the main deck. Therefore, the DB AVALON is not entitled to a coastwise endorsement. The Coast Guard violated its own regulations in approving the DB AVALON, and the Coast Guard should be ordered to revoke the DB AVALON's certificate of documentation.

5. <u>Diamond has standing against Curtin.</u>

When Diamond filed suit, Curtin filed a motion to dismiss. The federal defendants filed an answer. The relief Diamond would have this Court grant can be effective as to either: the DB AVALON has a foreign-built major component, so it is not entitled to a certificate of documentation with a coastwise endorsement, whether that relief comes from the Coast Guard taking the dredge's certificate or Curtin surrendering it. Still, standing is a prerequisite, and Diamond will address it.

   *a. Competitors have standing to challenge agency action or inaction under the APA.*

The Administrative Procedure Act has a presumption in favor of standing. *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993). This is not some abstract idea intuited from the statute's penumbra; it's right there at 5 U. S. C. § 702: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Therefore it is unsurprising that every court to look at the issue, until the district court here, has found standing when competitors have sued under the APA

41

and alleged credible economic harm from an adverse agency action. The Supreme Court held as much both before *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), in *Ass'n of Data Processing Serv. Orgs, Inc. v. Camp*, 397 U.S. 150, 152 (1970), and again after *Lujan*, in *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III injury-in-fact requirement.") (cleaned up, citing 3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994)).

More recently, the D.C. Circuit examined the issue in depth in *Mendoza v. Perez*, 754 F.3d 1002, 1010-11 (D.C. Cir. 2014), holding that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." (collecting cases, citing *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). The *Mendoza* court held that plaintiffs, who may work as herders (even though they were not working as herders at the time and hadn't for some time before) had standing to challenge an administrative change to a visa program for herders.

The Federal Circuit recognized competitor standing in *Canadian Lumber Trade Alliance v. U.S.*, 517 F.3d 1319 (Fed. Cir. 2008). Providing that the doctrine is "not yet well-developed in our Circuit," the Court cited the Supreme Court and D.C. Circuit, holding that the Canadian Wheat Board had standing to sue a U.S.

42

Customs distribution of money to the North Dakota Wheat Commission because "it is quite rational to assume Customs, by distributing money [to the North Dakota commission] is likely to inflict further economic injury on the Canadian Wheat Board." Continuing, the Court noted that in most competitor standing cases, it is *presumed* (i.e., without affirmative findings of fact) that a boon to some market participants is a detriment to their competitors." *Id.* at 1334 (emphasis in original).

The First Circuit, too, has recognized competitor standing in APA cases, in *Adams v. Watson*, 10 F.3d 915, 921-22 (1st Cir. 1993), challenging a state agency action. The Ninth Circuit recognized it in *Int'l Longshoremen's & Warehousemen's Union v Meese*, 891 F.2d 1374, 1379 (9th Cir. 1989), holding that when the INS allowed alien crewmen onboard cranes to load logs on logging vessels, the Longshoremen's Union had standing because its members "have lost an opportunity to compete for what they contend are traditional longshore jobs."

The case cited by the district court, *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009), is not an Administrative Procedure Act case. To the extent *KPMG* would be relevant, it has been overruled by *Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (*en banc*). In *Collins*, this Court recognized "the basic presumption of judicial review to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* at 564 (cleaned up). Continuing, this Court ruled that judicial review is available to

an aggrieved person under the APA "unless there is persuasive reason to believe that such was the purpose of Congress." The standard for standing under the APA "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 564-65, citing *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296 (2017). So finding, this Court found the plaintiffs, shareholders in Fannie Mae and Freddie Mac, had standing to challenge the structure of the Federal Housing Finance Agency. *Collins* is dispositive here. Diamond has standing to sue.

> b. *Every court, save the district court, has found competitors have standing to challenge Coast Guard approvals of foreign builds and rebuilds.*

Diamond has examined the four lead cases on Coast Guard approval of foreign builds and rebuilds in depth. In each of the four, the district court has found standing for competitors – whether the district court has ultimately agreed with the plaintiff (*American Hawaii*) or disagreed (*Philadelphia Metal*).

The alternative would be to put the great majority of agency action beyond review by this Court. Any agency action that tightens or loosens standards would have a purely hypothetical injury, and agencies would be free to regulate – or, as here, to abandon their regulations in the name of interpretation – without judicial oversight. Congress did not want that, so it wrote judicial review into the APA.

Courts do not want that, and they have found agency action reviewable under a competitor standing theory.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should enter judgment for Diamond, holding that the DB AVALON is not entitled to a certificate of documentation and therefore cannot dredge in U.S. navigable waters.

SUBMITTED BY:
S/Harry E. Morse
Martin S. Bohman
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

**CERTIFICATE OF SERVICE**

I certify that on May 16, 2023, the foregoing document was forwarded served via the Court's Cm/ECF Document Filing System, to all counsel.

S/Harry E. Morse

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 11048 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman 14.

S/Harry E. Morse

47