No. 23-20118

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Diamond Services Corporation,

Plaintiff – Appellant

v.

Curtin Maritime Corporation; Department of Homeland Security; National Vessel Documentation Center; United States Coast Guard; United States of America; Commandant Linda L. Fagan, United States Coast Guard; Port of Houston Authority,

Defendants - Appellees

On Appeal from
United States District Court for the Southern District of Texas

4:22-CV-2117

REPLY BRIEF OF APPELLANT DIAMOND SERVICES CORPORATION

SUBMITTED BY:
Harry E. Morse
Martin S. Bohman
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

# TABLE OF CONTENTS

**Contents**……………………………………………………………………**Pages**

Table of Contents ........................................................................................... ii

Table of Authorities ...................................................................................... iii

Argument ........................................................................................................1

   1. Plain meaning governs the interpretation of laws and regulations ......1

   2. The Coast Guard's rationale does not comport with the Coast Guard's regulatory definition ........................................................................... 4

   3. There is no longstanding history of approval of cranes on dredges ...7

   4. The Coast Guard's approval of the DB AVALON is contrary to the purpose of the Jones Act and the Foreign Dredge Act ....................... 8

   5. Diamond has standing ........................................................................10

Conclusion ................................................................................................... 13

Certificate of Service .................................................................................. 14

Certificate of Compliance ........................................................................... 15

## TABLE OF AUTHORITIES

**Cases**……………………………………………………………………**Pages**

*Advanced Energy United, Inc. v. Federal Energy Regulatory Comm'n*
    No. 22-1018 (D.C. Cir. July 14, 2023) ...................................................................11

*American Fuel & Petrochemical Manufacturers v. EPA*
    3 F.4th 373 (D.C. Cir. 2021) ...................................................................................11

*American Hawaii Cruises v. Skinner*
    713 F.Supp. 452 (D.D.C. 1989) ..........................................................................8, 12

*Auer v. Robbins*
    519 U.S. 542 (1996) .............................................................................................2, 4

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*
    467 U.S. 837 (1984) ............................................................................................. 2-3

*Curtin Maritime Corp. v. Pacific Dredge & Construction, LLC*
    76 Cal. App. 5th 651 (Ct. App. 2022) .......................................................................8

*Clarke v. Commodity Futures Trading Comm'n.*
    No. 22-51124 (5th Cir. July 21, 2023) ...................................................................13

*Entergy Corp. v. Riverkeeper, Inc.*
    556 U.S. 200 (2009) ..................................................................................................7

*Huntington Ingalls, Inc. v. Director, Office of Workers' Comp. Programs,*
    *United States Dep't of Labor*
    No. 21-60752, 2023 WL 3833853 (5th Cir. June 6, 2023) ......................................9

*Independent U.S. Tanker Owners Comm. v. Lewis*
    690 F.2d 908 (D.C. Cir. 1992) ..................................................................................9

*Kisor v. Wilkie*
    139 S.Ct. 2400 (2019) ....................................................................................... 2-3, 9

*Loper Bright Enterprises v. Raimondo*
    45 F.4th 359 (D.C. Cir. 2022)..........................................................................3

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ................................................................................ 12-13

*Mexican Gulf Fishing v. U.S. Dept. of Commerce*
    60 F.4th 956 (5th Cir. 2023) ............................................................................3

*Philadelphia Metal Trades Council v. Allen*
    C/A No. 07-145, 2008 WL 4003380 (E.D. Pa. Aug. 21, 2008) ......... 3, 12-13

*Shipbuilders Council of America v. U.S. Coast Guard*
    578 F.3d 234, 244-45 (4th Cir. 2009) .......................................................6, 12

*Spokeo, Inc. v. Robins*
    578 U.S. 330 (2016) ......................................................................................12

*Town of Chester v. Laroe Estates, Inc.*
    581 U.S. 433 (2017) ......................................................................................12

*Vitol, Inc. v. United States*
    30 F.4th 248 (5th Cir. 2022) ...................................................................... 3-4


**Statutes and Treatises**………………………………………………………**Pages**

5 U.S.C. § 702....................................................................................................13

46 U.S.C. § 12101 ...........................................................................................1, 7

46 U.S.C. § 12112 ...............................................................................................1

46 C.F.R. § 67.3 ..............................................................................................1, 7

Fed. R. Civ. P. 24(a)(2) .....................................................................................12

*Shipping under the Jones Act: Legislative and Regulatory Background*
    (November 21, 2019)......................................................................................9

**ARGUMENT**

1. <u>Plain meaning governs the interpretation of laws and regulations.</u>

A dredge that would work in U.S. territorial waters must be built in the United States. 46 U.S.C. § 12112. A rebuilt dredge can only work in U.S. territorial waters if it has been rebuilt in the United States – if all the major components of its hull and superstructure of the vessel have been fabricated in the United States, and the vessel has been assembled entirely in the United States.[1] 46 U.S.C. § 12101.

The DB AVALON is a dredge, but it has a crane that was not built in America. The crane on the DB AVALON is the part of the dredge that does the dredging. It would seem plain that the crane is a part of superstructure. The regulatory definition makes that clear: the superstructure is "the main deck and any other structural part above the main deck." 46 C.F.R. § 67.3. The crane on the DB AVALON is a structural part above the main deck, built foreign. The DB AVALON was not built or rebuilt in the United States out of United States parts. Therefore, the DB AVALON is not entitled to a coastwise endorsement. It cannot dredge in U.S. waters.

---

[1] Whether the DB AVALON was a new build or a rebuild is not determinative to this appeal. Still, it bears noting that the Coast Guard has never taken a position on whether the dredge was built, or whether it was rebuilt, telling Curtin that the dredge would be considered built in the United States, and would not be considered rebuilt foreign. ROA.287.

The Coast Guard does not offer any definition of structural part that would exclude the crane. Instead, it tells this Court that it need not define structural part, and it disavows "generic dictionary definitions of technical words like structural," Brief at 25, without offering any definition, technical or otherwise. Curtin likewise offers no definition of structural part, much less one that would exclude the crane on Curtin's dredge. Instead, the Coast Guard tells this Court that it is the agency's discretion "to fill in the blanks intentionally left by Congress to defer to the agency."

The agency would have this Court find that an agency interpretation of a published regulation is controlling unless it is plainly erroneous or inconsistent with the regulation, regardless of plain meaning. Brief at 9, citing *Auer v. Robbins*, 519 U.S. 542, 461 (1996). Relying on *Auer*, the Coast Guard further identifies no ambiguity in its regulations and offers no textual analysis, but still argues that this Court must afford deference and review the agency's decision on an arbitrary and capricious standard.

Congress requires that every major component of a vessel's hull and superstructure be built domestic. To the extent there are blanks in Congress's language, the Coast Guard filled in those blanks when it passed regulations through notice-and-comment rulemaking. The Coast Guard has to follow the language of its own regulations. Pretermitting whether there is any daylight between *Chevron* and

*Kisor*,[2] this is a *Kisor* case, not a *Chevron* case, and the touchstone is plain meaning. This Court need not ask whether the Coast Guard could define superstructure to exclude the crane; it need only address whether the Coast Guard's definition of superstructure does exclude the crane.

Plain meaning, derived from dictionaries, is how to resolve interpretive questions whether they are knotty or simple. See *Kisor*, 139 S.Ct. at 2415 ("[. . .] a court cannot waive the ambiguity flag just because it has found the regulation impenetrable on first read.") This is true for interpreting Coast Guard regulations. See e.g. *Philadelphia Metal Trades Council v. Allen*, C/A No. 07-145, 2008 WL 4003380 (E.D. Pa. Aug. 21, 2008) ("Virtually by definition, an appropriate source for obtaining the plain and ordinary meaning of a work or phrase is an English language dictionary.") It is just as true for any other type of law or regulation. See *Vitol, Inc. v. United States*, 30 F.4th 248, 253-54 (5th Cir. 2022) ("[W]e begin by examining the plain language of the statue, the words that Congress chose. We assume that the plain meaning of those words is the same as their ordinary (i.e., 'common' or 'natural') meaning, which is often derived from dictionaries.") (internal citations omitted).

---

[2] See generally *Mexican Gulf Fishing v. U.S. Dept. of Commerce*, 60 F.4th 956 (5th Cir. 2023), discussing the ongoing viability of *Chevron*. The Supreme Court has granted certiorari to reconsider *Chevron*. *Loper Bright Enterprises v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022) (Cert. Granted, No. 22-451 (May 1, 2023)).

The assumption that plain meaning governs is strong, not absolute. It yields when the statute provides another definition, or when the ordinary meaning is incompatible with the statutory context. *Id.* at 254. When the dictionary definition, the statutory definition, and the statutory context provide the answer, that is the answer. Only when textual analysis fails should the Court look at substantive canons. "[A] substantive canon (and the social policy it enhances) can never defeat concrete text (and the congressional policy it enshrines.)" *Id.* at 253. *Auer* is a substantive canon. It only applies when plain meaning and textual analysis fail.

Textual analysis here ends the inquiry. "Any structural part above the main deck" includes the crane on the DB AVALON. Diamond will not repeat the analysis from its brief. The Coast Guard's and Curtin's failure to define the words, and their failure to analyze the words in the regulation, is the best evidence that there is no definition of "any structural part" that excludes the dredging part of the dredge. There is no ambiguity here. The crane on the DB AVALON is a part of the superstructure of the dredge, built foreign. The dredge cannot dredge in U.S. waters.

2. The Coast Guard's rationale here does not comport with the Coast Guard's <u>regulatory definition.</u>

When Curtin applied to the NVDC for approval of its dredge, the NVDC approved the foreign-built crane on the basis that the crane can be removed, and the dredge is still a vessel. The Coast Guard tells this Court the same thing: the crane on

the DB AVALON is not a part of the superstructure because the DB AVALON remains a "water transportation vessel" even without the crane. Therefore, the crane is not a part of "the floatation envelope and structural integrity of the vessel below the main deck (hull) or structural part[] of the main deck or above the main deck (superstructure)." Brief at 19. The Coast Guard posits that if you can remove something from a vessel, and it is still a water transportation vessel after the removal, then that thing was never part of the superstructure in the first place.

This is not a definition because it does not explain the meaning of the words.[3] The Coast Guard's proffered rationale does not explain what a structural part is, or how it differs from a nonstructural part. If a structural part of a vessel is something that, when removed, leaves not-a-vessel behind, then structural parts of a house do not include the front door, the roof, and all interior walls too. A thirty-story office building without floors or elevators or stairs is still a building, so those parts are nonstructural. The structural parts of a car are just four wheels, two axles, and a chassis – no different from a Radio Flyer wagon.

The Coast Guard's explanation fails as a matter of textual analysis too, because it would redefine superstructure to be just the main deck, reading out "and any other structural part above the main deck." Diamond observed that the Coast

---

[3] At the risk of recursion, Diamond will wade in. A definition is "a statement of the meaning of a word or word group or a sign or symbol." https://www.merriam-webster.com/dictionary/definition (last checked July 20, 2023).

Guard's definition would exclude the control tower on the DB AVALON, and the Coast Guard confirms as much. The control tower or bridge on a ship are not a part of the floatation envelope, nor are they necessary for the structural integrity of a vessel. Take them away and the vessel is still a water transportation vessel. So too the mast on a sailboat, or the stacks or the above-deck cabins on a cruise ship. All the parts above the main deck can be removed and what is left behind will remain a water transportation vessel, even if, like the DB AVALON, removal of those parts means they can no longer do what they were designed to do.[4] Where the definition of superstructure is not just "the main deck," the Coast Guard must give meaning to the regulatory words "and any other structural part above the main deck."

Furthermore, if the Coast Guard had meant to say that the superstructure includes only those parts necessary for the floatation envelope and structural integrity of the vessel, it assuredly would have done so: those are the same words it used in defining hull. Instead, the Coast Guard used different words, and different words have different meanings. See e.g. *Shipbuilders Council of America v. U.S. Coast Guard*, 578 F.3d 234, 244-45 (4th Cir. 2009) ("In interpreting statutes and regulations, we have a duty, where possible, to give effect to all operative portions of the enacted language, including its every clause and word.") (cleaned up).

---

[4] It is possible that some sort of raised forecastle or raised quarterdeck from the age of sail may be part of the superstructure under the Coast Guard's rationale, but even there, removal of those parts would leave what remains a water transportation vessel.

Finally, the Coast Guard's explanation puts its regulation past the language of the statute. Where Congress legislates that "the construction of any major component of the hull or superstructure" must be done in the United States, 46 U.S.C. § 12101(a), Congress used the word "superstructure," not "main deck." The Coast Guard cannot read superstructure out of the statute.

3. There is no longstanding history of approval of cranes on dredges.

The Coast Guard tells this Court that its interpretation of structural part has been longstanding, and it cites to a letter from 2013 to that end. ROA.439. One approval, seventeen years after the definition was promulgated, does not make an interpretation consistent or longstanding.

If the Coast Guard had regularly approved foreign cranes on dredges, that would be of no moment. Agency misapplication of regulations never makes them appropriate. See *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 200, n. 13 (2009) ("[. . .] longstanding yet impermissible agency practice cannot ripen into permissible agency practice.") But the Coast Guard has not regularly approved foreign cranes on dredges. The Ambhibex approval to which the Coast Guard cites does not approve the crane, only the crane cab and other appurtenances. If it had, that establishes one approval in the thirty-five years between the Coast Guard's promulgation of definitions at 46 C.F.R. § 67.3 and the approval of the DB AVALON.

In extensive review of the NVDC's published approvals of vessels, Diamond has not found any similar to the crane on the DB AVALON, and the Coast Guard cites to none. Before the DB AVALON, Diamond is aware of no bucket dredges with foreign-built cranes. After the DB AVALON, foreign-built cranes have become the norm in new construction. In *American Hawaii Cruises v. Skinner*, 713 F.Supp. 452, 466 (D.D.C. 1989), the court noted that "the great majority of the agency's rebuild rulings that have been provided to the Court contain no standards to guide the rebuild inquiry." Diamond has reviewed all the Coast Guard's opinion letters. Outlined in Diamond's brief, they show that the Coast Guard has been inconsistent in requiring that superstructures be built domestic. Until the DB AVALON, the Coast Guard has never approved a foreign-built crane on a dredge. Since 2009, no one, to Diamond's knowledge, has challenged a Coast Guard approval in court.[5] That these approvals have gone unchallenged does not make them right.

4. The Coast Guard's approval of the DB AVALON is contrary to the purpose of the Jones Act and the Foreign Dredge Act.

The Coast Guard argues that its interpretation fits the purpose of the Jones Act and the Foreign Dredge Act. But the agency does not really address the purpose of

---

[5] Curtin challenged the approval of repairs to a competitor's dredge, but it did so in state court under an unfair competition theory, not under the APA. *Curtin Maritime Corp. v. Pacific Dredge & Construction, LLC*, 76 Cal. App. 5th 651 (Ct. App. 2022).

the statutes. Instead, it addresses flexibility, pointing out that the Second Proviso was in some respects left open for the Coast Guard to pass regulatory definitions.

This Court avoids "open-ended policy appeals and speculation about legislative intentions that are not otherwise apparent from the text and structure of the statute alone." *Huntington Ingalls, Inc. v. Director, Office of Workers' Comp. Programs, United States Dep't of Labor*, No. 21-60752, 2023 WL 3833853 (5th Cir. June 6, 2023), citing *Kisor,* 139 S. Ct. at 2442 (Gorsuch, J., concurring). But if this Court considers purpose, that consideration cuts against approval of the dredge. One aim of the Jones Act and the Foreign Dredge Act is for safety. Another is to ensure there is a thriving American shipbuilding industry. See generally *Independent U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 911-12 (D.C. Cir. 1992). There is little reason to believe that when Congress passed the actual language of the statutes, it really legislated that the Coast Guard has unfettered discretion.[6] There is less reason to think that allowing foreign-built cranes to be added to dredges will make dredges safer.

---

[6] The Congressional Research Service specifically noted the importance of domestic cranes to the military in its findings on the Jones Act. *Shipping under the Jones Act: Legislative and Regulatory Background*, November 21, 2019, available at https://sgp.fas.org/crs/misc/R45725.pdf. The importance of cranes is referenced at p. 22: "The military seeks cargo ships with flexible capabilities: ships not so large that they could face draft restrictions in some overseas harbors, ships with ramps or onboard cranes so that they can still unload cargo at underdeveloped or damaged ports, and ships that can carry a wide variety of cargo types and sizes.")

5. <u>Diamond has standing.</u>

If this Court rules in Diamond's favor and against the Coast Guard, the DB AVALON is not entitled to a certificate of documentation, and it cannot dredge in American waters. Diamond's remedy against Curtin is the same as Diamond's remedy against the Coast Guard: Curtin cannot use its dredge in American waters unless and until the crane is subject to and passes the major component test.

Curtin does not argue that its dredge is actually compliant with the regulations until page forty-six of its brief. Curtin further concedes that Diamond has standing against the Coast Guard. Though the better approach is to conclude that Diamond does have standing against Curtin, this Court could rule in Curtin's favor on standing, and the end result remains the same: Curtin cannot use its dredge in American waters.

Diamond has standing against Curtin for the same reason Diamond has standing against the Coast Guard: Diamond meets the Article III test for standing. Diamond is a leading bucket dredger in the Gulf of Mexico. ROA.11; ROA.19. Curtin is using the DB AVALON, a bucket dredge, in the Gulf of Mexico. ROA.11; ROA.24. Curtin and Diamond are competitors along the Gulf Coast and the Atlantic Coast. ROA.20. Curtin's dredge has a foreign crane that was, assuredly, much less expensive than the domestic-built cranes on Diamond's bucket dredges. ROA.11. Diamond cannot fairly compete with Curtin's dredge. ROA.20; ROA.24. Finally,

Diamond's sought relief – enjoining the use of the DB AVALON on US territorial waters and pulling its certificate of documentation – will level the playing field. Diamond has shown injury; traceability; and redressability.

Although neither the Coast Guard nor Curtin contest standing against the Coast Guard, standing is still a prerequisite, and Diamond would briefly touch further on the issue to show that Diamond has standing against the federal defendants. First is *Advanced Energy United, Inc. v. Federal Energy Regulatory Comm'n*, No. 22-1018 (D.C. Cir. July 14, 2023). The D.C. Circuit recognized the doctrine that "economic actors suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." There, the issue was review of a new energy transmission service across states in the Southeast. Unlike Curtin, which would have this Court decide its dredge's fate in absentia, in *Advanced Energy*, about nineteen power companies intervened on the basis that they had a direct and substantial interest that could not be adequately represented by any other party.

The *Advanced Energy* court cited *American Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373 (D.C. Cir. 2021), which held that a competitor must show "an actual or imminent increase in competition." With that showing, "the rest of the standing inquiry ordinary falls into place: the increased competition is caused by the agency's action and redressed by restoring the regulatory *status quo*

11

*ante.*" *Id.* at 379. There too, parties that felt they may be adversely affected by the court's ruling sought leave to intervene, which was afforded on the basis that their interests would not otherwise be represented.

The interventions are significant: in order to intervene by right under Fed. R. Civ. P. 24(a)(2), all the intervenors were required to establish standing. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017), citing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). Because the actually-affected parties had standing to intervene when a regulatory action to their benefit had been challenged, there would have been standing if the plaintiff would had sued them directly. Curtin would have had standing to intervene, and Diamond has standing against Curtin as a defendant.

In none of these cases did the court hold that a party has standing against an agency, but not against the plaintiff's competitor, because the standing inquiry under Article III is the same. Unsurprisingly, cases challenging Coast Guard action have typically involved the benefitted party too. In *American Hawaii*, the plaintiff sued both the agency and the vessel owner. The district court found standing. *Shipbuilders Council* took the same procedural posture. In *Philadelphia Metal Trades*, the plaintiff filed suit against federal defendants, and the affected parties intervened. The court found standing in large part *because* the shipyard intervened. Distinguishing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the *Philadelphia Metal Trades*

court held that *Lujan* was inapposite: "[b]ecause Aker is a party to this action and, thus, must abide by the ruling of the Court," the plaintiffs had standing. *Id.* at *17.

The *Philadelphia Metal Trades* position that the competitor must be a party to the suit is not the law in this Circuit. This Court has recently held that the aggrieved party can sue the agency without suing the beneficiary of improper agency action. In *Clarke v. Commodity Futures Trading Comm'n*, No. 22-51124 (5th Cir. July 21, 2023), the CFTC withdrew a no-action letter to PredictIt, a prediction market run by Victoria University, threatening PredictIt with a shutdown. The plaintiffs were traders and academics adversely affected by the proposed shut-down. The CFTC argued that the absence of Victoria University spoiled standing. This Court disagreed, holding that "the APA permits suit by anyone 'adversely affected or aggrieved by agency action.'" *Id.*, citing 5 U.S.C. § 702. Diamond could have just filed suit against the Coast Guard. Diamond properly sued Curtin as well.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should enter judgment for Diamond, holding that the DB AVALON is not entitled to a certificate of documentation and therefore cannot dredge in U.S. navigable waters.

SUBMITTED BY:
S/Harry E. Morse
Martin S. Bohman
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

13

**CERTIFICATE OF SERVICE**

I certify that on August 1, 2023, the foregoing document was served via the Court's CM/ECF Document Filing System, to all counsel.

S/Harry E. Morse

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1, this document contains 3,290 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman 14.

S/Harry E. Morse