# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 23-20118

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2024

Lyle W. Cayce
Clerk

Diamond Services Corporation,

*Plaintiff—Appellant,*

*versus*

Curtin Maritime Corporation; Department of
Homeland Security; National Vessel Documentation
Center; United States Coast Guard; United States of
America; Commandant Linda L. Fagan, United States
Coast Guard; Port of Houston Authority,

*Defendants—Appellees.*

———————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-2117

———————————

Before Richman, *Chief Judge*, and Haynes and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

Under federal law, vessels may dredge in United States waters only if they are "built in the United States." The agency tasked with making this determination is the United States Coast Guard. Curtin Maritime Corporation ("Curtin") sought the Coast Guard's ruling that its dredging barge, the DB AVALON ("AVALON"), could operate in United States

No. 23-20118

waters, despite the fact that the vessel would incorporate foreign-made spuds and a crane. The Coast Guard ruled the AVALON would be considered United States-built. One of Curtin's competitors challenged that ruling as arbitrary and capricious. The district court deferred to the Coast Guard's reasonable interpretation of its own regulations, *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997), and granted the Coast Guard summary judgment. We AFFIRM.

## I.

## A.

Federal law imposes certain requirements before a vessel may dredge in the navigable waters of the United States. Among other things, a vessel must have "a certificate of documentation ["COD"] with a coastwise endorsement." 46 U.S.C. § 55109(a)(3).[1] CODs are issued by the National Vessel Documentation Center ("NVDC"), an arm of the Coast Guard. Only vessels "built" or "rebuilt" in the United States are eligible for a coastwise endorsement. *Id.* §§ 12112(a)(2)(A), 12132(b). A vessel is rebuilt in the United States "only if the entire rebuilding, including the construction of any major component of the hull or superstructure, was done in the United States." *Id.* § 12101(a).

Coast Guard regulations flesh out this statutory framework. The regulations consider a vessel built in the United States if (1) "[a]ll major components of its hull and superstructure are fabricated in the United States," and (2) "[t]he vessel is assembled entirely in the United States." 46 C.F.R. § 67.97(a), (b). Conversely, a vessel is "deemed rebuilt foreign" (hence, not built or rebuilt in the United States) when "any considerable part

---

[1] The vessel must also be wholly owned by and, if applicable, chartered by U.S. citizens. *See id.* § 55109(a)(1), (2).

No. 23-20118

of its hull or superstructure is built upon or substantially altered outside of the United States." *Id.* § 67.177; *see also id.* § 67.177(a)–(g) (setting out "parameters" to determine whether a vessel is "rebuilt foreign"). The regulations define "hull" as "the shell, or outer casing, and internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." *Id.* § 67.3. "Superstructure" is defined as "the main deck and any other structural part above the main deck." *Ibid.*

The Coast Guard uses two different tests to determine whether work done to a vessel's hull or superstructure qualifies it as rebuilt foreign. With respect to vessels of any hull construction, the "major component" test deems a vessel rebuilt foreign "when a major component of the hull or superstructure not built in the United States is added to the vessel." *Id.* § 67.177(a). The Coast Guard defines "major component" as a "new, separate and completely-constructed unit" weighing more than 1.5% of the vessel's steelweight. With respect to steel- or aluminum-hulled vessels only, the "considerable part" test considers the relative weight of the work done on the hull or superstructure. *See id.* § 67.177(b).[2]

---

[2] Specifically, the considerable part test provides:

(1) A vessel is deemed rebuilt when work performed on its hull or superstructure constitutes more than 10 percent of the vessel's steelweight, prior to the work, also known as discounted lightship weight.

(2) A vessel may be considered rebuilt when work performed on its hull or superstructure constitutes more than 7.5 percent but not more than 10 percent of the vessel's steelweight prior to the work.

(3) A vessel is not considered rebuilt when work performed on its hull or superstructure constitutes 7.5 percent or less of the vessel's steelweight prior to the work.

*Id.* § 67.177(b)(1)–(3).

No. 23-20118

### B.

On September 10, 2019, Curtin applied to the Coast Guard for a preliminary determination that its dredging barge, the AVALON, would be eligible to operate in coastwise trade. *See id.* § 67.177(g) (establishing requirements for a "preliminary rebuilt determination"). The AVALON would be constructed of steel at a shipyard in the United States. Curtin's application explained, however, that the vessel's spuds[3] and crane would be removed from a foreign vessel and installed after being shipped to the United States. The crane would be "bolted to the [AVALON's] hull, not welded, using a mounting ring," and the spuds would also be removable.

On September 24, 2019, the NVDC's Director issued a determination that the AVALON "would be considered built in the United States" under 46 C.F.R. § 67.97 and not "rebuilt foreign" under § 67.177. Because the crane and spuds would be removable, the AVALON would "remain a complete and intact vessel and [would] be fully capable of operating as a vessel without the spuds and crane." As a result, "the spuds and crane would be considered outfitting and not part of the hull or superstructure."[4] Accordingly, the AVALON would be eligible for a coastwise endorsement.

-------------------

[3] Spuds are long stakes attached to a dredge that bore into the ground underneath the water to provide the dredge increased stability while dredging. *See Dredge*, Encyc. Britannica, https://www.britannica.com/technology/dredge-excavation#ref29604 (Dec. 19, 2023) [https://perma.cc/4A2Q-LP6R].

[4] The Director found support for her conclusions in a Coast Guard Memorandum titled *Review Criteria for Steel Weight Components wrt U.S. Build and Foreign Rebuild Determinations*. Section (i) of the Memorandum provided that cranes are considered outfitting and thus not part of the hull or superstructure. Spuds are not directly addressed in the Memorandum, but the Director analogized spuds to detachable buoyant floats in Section (e). Because spuds and detachable buoyant floats are both used to augment a vessel's stability during certain operations but are otherwise unnecessary for the vessel's

No. 23-20118

In April 2021, Curtin contracted with Conrad Shipyard ("Conrad") in Amelia, Louisiana, to construct the AVALON's hull and superstructure. The AVALON's outfitting work was done in Morgan City, Louisiana. The vessel's control tower came from the CONTI, a United States supply vessel with a coastwise endorsement. The crane and spuds were acquired from a foreign-flagged crane barge, the SHINSO-300, and placed on the AVALON in Morgan City.

On July 27, 2022, the NVDC issued the AVALON a COD with a coastwise endorsement.

Around this time, the Port of Houston Authority ("the Port") solicited bids to expand the Houston Ship Channel. After receiving six bids from different contractors, the Port awarded the project to Curtin. Curtin's competitor, Diamond Services Corporation ("Diamond"), did not bid on the project, nor did it submit a protest objecting to the Port's awarding the project to Curtin.

## C.

On June 28, 2022, Diamond sued Curtin, the Port, and several federal defendants (collectively, "the Federal Defendants").[5] Seeking relief under the Administrative Procedure Act ("APA") and the Declaratory Judgment Act ("DJA"), Diamond asked the district court to declare that AVALON's COD was issued in violation of federal law; to enjoin Curtin from performing

---

normal stability, they "are not included in the flotation envelope." Accordingly, the spuds are considered outfitting and thus not part of the hull or superstructure.

[5] The Federal Defendants are the United States; the Department of Homeland Security; the Coast Guard; the NVDC; and Linda L. Fagan, the Coast Guard Commandant.

No. 23-20118

any jobs involving the AVALON in United States waters; and to enjoin the Port from awarding Curtin funds or work involving the AVALON.

Curtin and the Port moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing, *inter alia*, that Diamond lacked standing and failed to state a claim. Diamond moved for summary judgment against Curtin, the Port, and the Federal Defendants. The Federal Defendants moved for summary judgment against Diamond.

A magistrate judge recommended that the district court deny Diamond's motion for summary judgment; grant Curtin and the Port's motions to dismiss for lack of standing; and grant the Federal Defendants' motion for summary judgment. *See Diamond Servs. Corp. v. Curtin Mar. Corp.*, 2023 WL 2634508 (S.D. Tex. Mar. 6, 2023). Diamond timely objected, but the district court adopted the recommendations in full. *See Diamond Servs. Corp. v. Curtin Mar. Corp.*, 2023 WL 2634046 (S.D. Tex. Mar. 22, 2023).

Diamond now appeals.

## II.

We review *de novo* a Rule 12(b)(1) dismissal for lack of standing. *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 334 (5th Cir. 2021). We also review the grant of summary judgment *de novo*, using the same standards as the district court. *Paymentech, L.L.C. v. Landry's Inc.*, 60 F.4th 918, 924 (5th Cir. 2023); Fed. R. Civ. P. 56(a).

## III.

### A.

We first consider standing. Diamond "has standing to sue if [its] injury is traceable to the defendant and a ruling would likely redress it." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 639 (5th Cir.

No. 23-20118

2023) (citation omitted). Diamond does not argue it has standing to sue the Port and so has forfeited any argument that the district court erred in dismissing the Port on that ground. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). But Diamond does argue it has standing to sue Curtin as one of its "competitors." We disagree.

Diamond cites cases allowing plaintiffs to sue an agency or its officials under the APA on the ground that they wrongly "lift[ed] regulatory restrictions on their competitors or otherwise allow[ed] increased competition." *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (quoting *La. Energy & Power Auth. v. Fed. Energy Regul. Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998)); *see also Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 176 (D.C. Cir. 2022); *Adams v. Watson*, 10 F.3d 915, 920–25 (1st Cir. 1993); *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1379 (9th Cir. 1989). These cases show why Diamond has standing to sue the Federal Defendants, something no one contests. But they do not support Diamond's standing to sue its competitor, Curtin, under the APA. Diamond cites no authority for that proposition. "Standing to sue one defendant does not, on its own, confer standing to sue a different defendant." *Daves v. Dallas County*, 22 F.4th 522, 542 (5th Cir. 2022) (en banc).

Accordingly, the district court did not err by dismissing Curtin for lack of standing.

## B.

We proceed to the merits of Diamond's claim against the Federal Defendants. Specifically, we consider whether the Coast Guard violated the APA by issuing the AVALON a COD with a coastwise endorsement. The Federal Defendants say it did not, urging us to defer to the Coast Guard's interpretation of its own regulations.

No. 23-20118

Such deference is warranted if certain requirements are met. As clarified by the Supreme Court recently, a court will defer to an agency's interpretation of a regulation only after "exhaust[ing] all the traditional tools of construction" and finding the regulation "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415 (internal quotation marks and citation omitted) (discussing *Auer*, 519 U.S. 452). Even in that event, however, the agency's interpretation must be "reasonable." *Ibid.* And even then, a court "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416. For instance, the agency must have "actually made" the interpretation, which "must in some way implicate its substantive expertise" and "reflect fair and considered judgment." *Id.* at 2416–17 (internal quotation marks and citation omitted).

Accepting the magistrate judge's recommendation, the district court concluded deference to the Coast Guard was warranted. The court found the regulations were genuinely ambiguous because they did not specify whether cranes and spuds are "part of the hull or superstructure," nor whether they are "considered major components, or . . . a structural part." Furthermore, the Coast Guard reasonably interpreted its regulations to focus on whether the crane and spuds "could be removed without affecting the [AVALON's] operation as a vessel, the structural integrity of the hull, or the integrity of the superstructure." That interpretation, the court reasoned, fell within the agency's expertise and was consistent with its longstanding application of its regulations.

On appeal, Diamond argues the district court erred in deferring to the Coast Guard. Specifically, Diamond contends that, contrary to the agency's reading of its regulations, the crane is a "structural part" of the AVALON's

No. 23-20118

superstructure and thus subject to the major component test.[6] Applying that test, Diamond argues, would render the AVALON foreign built and consequently unable to dredge in United States waters.

1.

We first consider whether the pertinent regulations are "genuinely ambiguous," starting with their text. *See id.* at 2414. Diamond insists that the phrase "structural part" in the definition of "superstructure" plainly includes the AVALON's crane. Recall that "superstructure" is defined as "the main deck and *any other structural part* above the main deck." 46 C.F.R. § 67.3 (emphasis added). Diamond proposes a definition of "structural" as "[f]orming a necessary part of the structure of a building or other construction, as distinct from its decoration or fittings." *See Structural*, Oxford English Dictionary (6th ed. 2007). It argues that, by this definition, the crane is "structural" because it "is a necessary part of the dredge" and "not a decoration or fitting." We disagree.

The regulation is silent as to what constitutes a "structural part" of the vessel, and of course it says nothing about whether a dredging barge's crane qualifies as such. Diamond would fill that silence with specific concepts—"necessary" versus "decoration or fittings"—to make a crane part of the vessel's structure. Possibly that is one way to define "structural part," but the mere fact that Diamond must add content to the phrase suggests it does not *unambiguously* include cranes. Besides, the Coast Guard's alternative reading—focusing on whether removing the crane would impair the vessel's operational integrity—is a plausible interpretation of

---

[6] Diamond makes no separate arguments on appeal regarding the agency's determination that the spuds were not part of the AVALON's hull or superstructure. Diamond has therefore forfeited any argument that the district court erred with respect to the spuds. *See SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022); *Rollins*, 8 F.4th at 397.

No. 23-20118

"structural."[7]   Accordingly, we cannot say that the regulatory text unambiguously makes the crane a "structural part" of a dredging barge. *See Kisor*, 139 S. Ct. at 2414.

Nor does history settle the matter. *See id.* at 2415. The regulation's seeds lie in the 1920 Jones Act, which restricted coastwise trade to United States-built and -owned vessels. *See* Pub. L. No. 66-261, 41 Stat. 988; *see also* 46 U.S.C. § 55102(b). When shipbuilders tried to dodge this restriction by repairing domestic vessels overseas, Congress enacted the 1956 "Second Proviso," disqualifying vessels if "rebuilt outside the United States." The story did not end there, though. Later regulations permitted some foreign parts because it was thought undesirable to disqualify a vessel merely for a foreign-sourced "minor alteration." That course correction "allow[ed] American shipyards to continue building vessels without imposing limitations on the source of parts so excessive as to render the American construction of ships too expensive to pursue." *Phila. Metal Trades Council, MTD, AFL-CIO v. Allen*, 2008 WL 4003380, at *19 (E.D. Pa. Aug. 25, 2008). This history is instructive, to be sure, but not determinative. It tells us only that *some* foreign-sourced parts are permitted without barring a vessel from coast-wise trade. It does not tell us, however, whether a dredging barge's crane falls into that category.

Finally, the broader regulatory framework also leaves the question open. *See Kisor*, 139 S. Ct. at 2415. In support of the Coast Guard's interpretation, the Federal Defendants point to a different definition of "superstructure" pertaining to load lines. That definition limits

---

[7] *See Structural*, Cambridge Dictionary (4th ed. 2013) (defining "structural" as "relating to the structure of a building or similar object"); *Structure*, Cambridge Dictionary (4th ed. 2013) (defining "structure" as "the arrangement or organization of parts in a system").

superstructure to deck structures that "extend[] from side to side of the vessel" (or nearly so). 46 C.F.R. § 42.13–15(j)(1). The Federal Defendants argue this definition excludes a crane because it does not span the vessel's breadth. Perhaps one definition of "superstructure" may shed light on the other, but the fact remains that the two definitions are phrased differently. We cannot say that the § 42.13–15(j) definition plainly excludes cranes from the separate definition in § 67.3.

In sum, the "traditional tools" of statutory construction show the regulation is ambiguous as to whether the crane is part of the AVALON's superstructure. *Kisor*, 139 S. Ct. at 2415. So, the analysis must continue.

2.

The next step asks whether the Coast Guard's reading of the regulation was reasonable. *Id.* at 2416. A reasonable reading is one that "come[s] within the zone of ambiguity" in the regulatory text. *Ibid.* Diamond contends the reading was unreasonable for several reasons.

First, Diamond contends the Coast Guard did not engage the text at all but instead imported the concept of "outfitting." (Recall that the agency found the crane and spuds "would be considered outfitting and not part of the hull or superstructure.") According to Diamond, the Coast Guard needed to introduce "outfitting" through formal notice-and-comment rulemaking, not merely through internal memoranda. We disagree.

The Coast Guard uses the term "outfitting" as a shorthand to describe those parts of a vessel that are not "structural." For example, the Coast Guard's review criteria state that, while superstructure includes "portions of the hull extending above the freeboard deck, such as forecastles," it does not include "breakwaters, crane or mast houses, or ventilation or exhaust trunks (these being outfitting components)." Another section states that "winches & booms, kingposts, cranes, etc., are outfitting

items and not included as hull structure." Diamond cites no authority for the proposition that the agency needed to engage in notice-and-comment rulemaking before using the term "outfitting" in its analysis.[8] More to the point, the Coast Guard's use of the term in its review criteria merely seeks to differentiate structural from non-structural parts—squarely within the regulatory zone of ambiguity we have already described.[9] *See ibid.*

Diamond next argues that the Coast Guard reads "superstructure to overlap entirely with hull," rendering superstructure superfluous. Evidently, Diamond's argument is this: in the superstructure analysis, the agency considers whether a part contributes to a vessel's structural integrity—which is a concept also featured in the definition of hull. *See* 46 C.F.R. § 67.3. We again disagree. The Coast Guard considers as superstructure parts of a vessel that could not conceivably be part of its hull. For example, the review criteria considers deckhouses and pilothouses as superstructure. Those are obviously not part of the hull—meaning, they are not the vessel's shell, outer casing, or internal structure below the main deck. *Ibid.* But the agency considers them superstructure because, without them, a vessel cannot remain "a means of transportation on water." *See ibid.* Diamond disagrees with this

---

[8] To the extent Diamond suggests the public lacked notice of the Coast Guard's criteria, it is mistaken. The review criteria are publicly available on the NVDC's website. *See Nat'l Vessel Docum. Ctr.*, U.S. COAST GUARD, https://www.dco.uscg.mil/Our-Organization/Assistant-Commandant-for-Prevention-Policy-CG-5P/Inspections-Compliance-CG-5PC-/National-Vessel-Documentation-Center/Determination-Letters/ (last visited Jan. 3, 2024) [https://perma.cc/J7AN-4Y8Y] (selecting "Review Criteria" from the category "U.S. Build Determinations," then selecting "Review Criteria for Steel Weight Components 08-19-2021").

[9] Diamond argues that the district court's rationale impermissibly diverges from the agency's. It contends the district court "created a definition [of structural part] for the Coast Guard" focused on the vessel's "integrity." We disagree. The district court merely explained what was already implicit in the Coast Guard's distinction between structural parts and outfitting.

No. 23-20118

categorization, but that does not render the Coast Guard's interpretation unreasonable. After all, *Kisor* requires only that the agency's reading must "fall within the bounds of reasonable interpretation," 139 S. Ct. at 2416, not that the agency's interpretation must align with a party's preferences.[10]

Diamond next contends that the Coast Guard's interpretation was unmoored from its prior rulings. Not so. The agency had determined in the past that "the cranes, outriggers, spuds and other mechanical systems [are] deck equipment," and thus "not integral to the hull or superstructure." It also found that Portable Accommodation Modules are not part of the hull or superstructure.[11] The implicit premise for these determinations is that the items at issue are not structural parts, and so not necessary to the vessel's integrity. Diamond fails to explain how these prior rulings are inconsistent with its present determination about the AVALON's crane.

Finally, Diamond argues that the Coast Guard's interpretation runs afoul of various precedents. We again disagree. Diamond first relies on the Fourth Circuit's decision in *Shipbuilders Council of America v. U.S. Coast Guard*, 578 F.3d 234 (4th Cir. 2009). But that case addressed work that unquestionably involved the hull, not the antecedent question about whether

─────────────────

[10] Diamond points out that the Coast Guard ruled in 2013 that an operator's cab—which Diamond claims is a type of deckhouse—was not superstructure. This is immaterial. Regardless of whether an operator's cab is similar to a traditional deckhouse or pilothouse, the ruling was made before the Coast Guard revised its criteria in March 2019, which categorized deckhouses and pilothouses as superstructure. The revised criteria applied to the AVALON, not criteria from 2013.

[11] Portable Accommodation Modules ("PAMs") provide additional living or office space on vessels that require more crew members than can be accommodated by the vessel's permanent quarters. *See Guide for Portable Accommodation Modules*, Am. Bureau of Shipping, https://ww2.eagle.org/content/dam/eagle/rules-and-guides/current/offshore/193_portacmod_2022/portable-accommodation-modules-guide-feb22.pdf [https://perma.cc/4LTV-2FFY].

some component is part of the hull or superstructure. *See id.* at 237 (addressing a statute that required "all oil tankers in the coastwise trade [to] be equipped with double hulls by a specified date"). Second, the district court decision in *Philadelphia Metal* supports the Coast Guard, not Diamond. The court upheld the Coast Guard's determination that foreign-made equipment modules did not disqualify vessels from U.S.-built status. *Phila. Metal*, 2008 WL 4003380, at *19–21. Third, in *American Hawaii Cruises v. Skinner*, a district court reversed the Coast Guard because its determination to allow foreign parts was conclusory, based on an impermissibly vague test, and inconsistent with prior agency rulings. 713 F. Supp. 452, 465–69 (D.D.C. 1989).[12] Here, by contrast, the Coast Guard explained its ruling that the crane is not a structural part because its removal would leave the AVALON still able to function as a vessel. And Diamond has not established that the Coast Guard's ruling is inconsistent with prior agency decisions.

In sum, we conclude that the Coast Guard's ruling was reasonable.

3.

Finally, we must "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, 139 S. Ct. at 2416. "[E]specially important markers" for this inquiry are whether the interpretation (1) was actually made by the agency; (2) implicates the agency's substantive expertise; and (3) reflects fair and considered judgment. *Id.* at 2416–17. We agree with the Federal Defendants that the Coast Guard's interpretation checks all three boxes. (Diamond does

---

[12] In the same vein is *Keystone Shipping Co. v. United States*, where a district court remanded to the Coast Guard because its determination at issue was vague and contrary to its prior decisions. 801 F. Supp. 771, 781–83 (D.D.C. 1992).

No. 23-20118

not seriously argue otherwise, but we note these considerations for the sake of completeness.)

First, the interpretation "emanate[d]" from the officials in charge of the agency, employing those vehicles "understood to make authoritative policy." *Id.* at 2416. The Coast Guard acted through the NVDC, its arm tasked with making vessel documentation rulings, and the ruling came from its Director, not a lower-level staffer. Moreover, once delivered to Curtin, the NVDC placed the letter on its publicly available website alongside other similar letters.[13] So, the Coast Guard's determination here was not merely an *ad hoc* statement but rather the agency's "official position." *Ibid.*

Second, the ruling was the result of the Coast Guard's "[a]dministrative knowledge and experience." *Id.* at 2417. As noted, the NVDC is the arm of the Coast Guard that specializes in making rebuilt determinations like the one Curtin requested.

Third, the Coast Guard's ruling was neither "a merely convenient litigating position [nor a] *post hoc* rationalization advanced to defend past agency action against attack." *Ibid.* (cleaned up). Nor was it "a new interpretation . . . that creates unfair surprise to regulated parties." *Id.* at 2418 (internal quotation marks and citation omitted). The Coast Guard's interpretation here was neither novel nor surprising, but drew on a line of its own publicly-available precedents.

---

[13] *See Nat'l Vessel Documentation Ctr.*, U.S. COAST GUARD, https://www.dco.uscg.mil/Our-Organization/Assistant-Commandant-for-Prevention-Policy-CG-5P/Inspections-Compliance-CG-5PC-/National-Vessel-Documentation-Center/Determination-Letters/ (last visited Dec. 20, 2023) [https://perma.cc/XSY4-45VF].

No. 23-20118

## IV.

The district court properly deferred to the Coast Guard's determination and granted summary judgment for the Federal Defendants.

AFFIRMED.